**Ronald ADCOCK, et al.**

v.

**The FIRESTONE TIRE & RUBBER CO.**

No. 3–83–0037.

United States District Court, M.D Tennessee, Nashville Division.

Aug. 6, 1985.

John L. Van Cleave, Robert E. Hoehn, Nashville, Tenn., for plaintiffs.

William N. Ozier, Nashville, Tenn., for defendant.

## MEMORANDUM

WISEMAN, Chief Judge.

This Court must decide whether employees who have not lost a day of pay or any significant deviation in their job responsibilities are entitled to severance pay benefits when their former employer sells the employee's place of employment to a successor corporation who immediately steps in and continues plant operations without an interruption in production. The case is brought by former nonunion, salaried employees of the Firestone Tire & Rubber Company pursuant to federal question jurisdiction, 28 U.S.C. § 1331, asserting claims under the Employment Retirement Income Security Act [ERISA], 29 U.S.C. § 1101, *et*

*seq.* (1982), for the recovery of certain pension and severance pay benefits that allegedly were lost upon Firestone's sale of its Lavergne tire facility in 1982. The focus of this memorandum is limited solely to the issue of severance pay benefits.

In 1982, Firestone sold its Lavergne facility as an ongoing operation to the Bridgestone Tire Company. Prior to the sale, all the plaintiffs were employees of Firestone and, upon consummation of the divestiture, became employees of Bridgestone without losing a day of pay. During its operation of the Lavergne facility, Firestone maintained a severance pay plan for the benefit of its employees. Upon divestiture Firestone refused to pay such benefits, asserting that no contingency had occurred resulting in maturation of severance pay rights. Pending before the Court are cross motions for partial summary judgment on the severance pay issue. A hearing was held by the Court on Wednesday, April 10, 1985. The Court grants the motion for summary judgment of defendant Firestone and defines the rights and obligations of the parties.

### I. *Facts*

At the time of divestiture, the plaintiffs were nonunion, salaried employees of Firestone. Firestone maintained a non-funded non-contributory severance pay benefit plan for its employees. The details of the plan are contained in two documents. The first document is the Salaried Employees Handbook, which was distributed to all employees. On page H–3, the handbook provides:

**Termination pay.**

If you are released from the company because you become unable to perform your job or because of a reduction in work force and you have not yet qualified for early retirement, you will be given termination pay. The amount of termination pay is based on your credited company service and specific reasons for your release.

No other details as to rights or the operation of the severance pay plan are provided in the handbook. The plaintiffs assert that

Firestone's sale of the facility to Bridgestone and their "transfer" of employment to Bridgestone constituted a "reduction in work force" thereby giving rise to a duty upon Firestone to pay severance benefits. Firestone denies a reduction in work force has occurred. Termination on account of a reduction in force is calculated at the rate of two weeks of pay per year of service with the corporation.

The second source of information on the severance pay plan is contained in the Firestone Salaried Personnel Manual. The Manual was maintained as a confidential document and was not distributed to employees. In contrast to the one paragraph description of severance pay rights contained in the employee handbook, the personnel manual contains approximately thirty pages of detailed information concerning the administration of the severance pay benefit plan.

At some point prior to the divesture of the Lavergne facility, but after specific requests for information by Firestone employees as to their right to severance pay in the event of Firestone's divesture of the Lavergne facility, Firestone amended the confidential personnel manual to provide:

**Job-offer Refusal.**

An employee whose job is eliminated and who refuses an offer (not involving a geographical relocation) of a position having at least the same grade level and paying at least the same salary will be considered terminated as a resignation with no R.I.F. payment or benefits; or, if eligible, employee may retire.

Personnel Manual at Section 2.11.0(K) (revised November 1, 1982).

On Friday, January 10, 1983, Firestone sold its Lavergne facility to Bridgestone. The following Monday the employees reported to work as usual, but were now producing Bridgestone products as Bridgestone employees.

The former Firestone employees requested Firestone to provide severance pay in light of their termination of employment with the company. Firestone denied severance pay benefits to all employees, maintaining that no reduction of force occurred giving rise to a duty to pay such benefits. Plaintiffs subsequently brought suit in this Court claiming wrongful denial of their severance pay benefits in violation of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq.* and, also, Tennessee contract law.

## II. *Jurisdiction*

Plaintiffs invoke federal question jurisdiction of this Court, 28 U.S.C. § 1331, raising claims under the Employee Retirement Income Security Act. ERISA provides a private right of action to any beneficiary to enforce the terms of either a pension or a welfare benefit plan. 29 U.S.C. § 1132(a)(3)(B)(ii). Noting that the provisions of Firestone's severance pay plan fall within ERISA's definition of an "employee welfare benefit plan," 29 U.S.C. § 1002(1); 29 U.S.C. § 186(c)(6); 29 C.F.R. § 2501.3–1,[1] the Court determines that the plaintiffs claim that they were wrongfully denied severance pay benefits states a cause of action under ERISA sufficient to vest this

---

**1.** In *Gilbert v. Burlington Industries, Inc.*, 765 F.2d 320 (2d Cir.1985) (available on Westlaw), the Second Circuit rejected plaintiff's position that the employer's severance pay policies were merely a "payroll practice" and therefore not subject to ERISA. "When ties that bind an employee to his or her company are severed by the employer, unemployment to the employee—whether fleeting or permanent—is an inexorable consequence. Thus, in our view severance pay is an unemployment benefit and an unfunded severance pay policy constitutes an 'employee welfare benefit plan' under § 1002(1)(A)." *Id.* at 325 (citing cases). The court affirmed the

district court's dismissal of plaintiffs' state law claims holding that ERISA preempted a New York state law authorizing the Commissioner of Labor to order the employer to make severance payments to terminated employees.

At the time of the interlocutory appeal, the district court had not yet decided the remaining substantive issues under ERISA concerning whether the plaintiff employees were entitled to severance pay upon the sale of their place of employment as an ongoing concern when the plaintiffs were retained in their positions with the successor corporation.

Court with jurisdiction. 29 U.S.C. § 1132(e)(1).

■ Plaintiffs' pendent state law claims are dismissed for failure to state a claim on which relief can be granted. Fed.R.Civ.P. 12(b)(6). ERISA preempts state law provisions concerning employee benefit plans, federalizing the area of pension rights and related ancillary welfare benefits by establishing uniform standards of fiscal responsibility for the administration of such plans. H.R.Rep. No. 93–533, 93d Cong. 2d Sess., in 1974 U.S.Code Cong. & Admin. News 4639 at 4639–40 [House Report]; *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981); *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1215 (8th Cir.1981), *cert. denied*, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981); *Scott v. Gulf Oil Corp.* 754 F.2d 1499 (9th Cir. 1985).

### III. *Applicable Law*

A. *Standard of Review on Summary Judgment.*

A party moving for summary judgment bears the burden of demonstrating the nonexistence of any genuine issue of fact material to a judgment in his favor. *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 147, 90 S.Ct. 1598, 1603, 26 L.Ed.2d 142 (1970); *United States v. Article of Device ... "Diapulse"*, 527 F.2d 1008, 1011 (6th Cir.1976). A party who demonstrates the absence of any material fact and that the applicable law warrants a judgment in his favor is entitled to an order of summary judgment as a matter of law.

In reviewing the materials submitted to the Court on the motion for summary judgment, the Court will evaluate the inferences that may be drawn from the underlying facts contained in the pleadings, affidavits, exhibits, and depositions, and will view those inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Bohn Aluminum & Brass Corporation v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962). The Court adheres to these procedural standards in its review of the facts and the application of the appropriate law.

B. *The Employment Retirement Income Security Act—ERISA*

1. *Pension Plans and Welfare Benefit Plans Defined*

In defining the nature of the plaintiffs' rights under the Firestone severance pay plan, an initial distinction must be drawn between *pension* and *welfare benefit* plans. Pensions are a form of deferred compensation to which an individual employee accrues rights by providing a period of service to a particular employer. Pensions provide the employee a secured measure of income following his retirement from active employment, thereby assuring a source of economic resources during one's later years of life. Welfare benefits plans, on the other hand, are not necessarily intended as deferred income to assure economic stability during one's post-employment days. Rather, the plans often serve as a form of deferred, frequently contingent, benefit that is offered by virtue of one's affiliation as an employee of a certain employer.[2]

---

2. ERISA defines a welfare benefit plan as follows:

The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization or by both, to the extent that such plan, fund or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the

event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 188(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions). 29 U.S.C. § 1002(1).

ERISA defines a pension plan as follows: The terms "employee pension benefit plan" and "pension plan" mean any plan, fund, or program which was heretofore or is hereafter

## 2. Pension Plans and Welfare Benefit Plans Distinguished "Vesting"

■ Despite the different purposes served by pension as compared to welfare benefit plans, ERISA mandates common reporting and disclosure requirements, 29 U.S.C. §§ 1021–31, and standards of fiduciary conduct, 29 U.S.C. §§ 1101–14, governing the employer's administration of the plans. However, unlike pension plans, welfare benefits plans are not subject to any ERISA minimum substantive content provisions. If an employer chooses to offer his employees the option of joining a pension plan, ERISA mandates specific standards concerning the vesting of benefits, and participation and funding obligations. In contrast, if an employer offers a welfare benefit plan, such as severance pay or health insurance, ERISA does not require the plan to guarantee vesting rights, nor does it prescribe the fiscal structure of assets that support the plan. An employee "accrues" a vested interest in a pension plan upon meeting eligibility requirements to participate in such a plan. However, because welfare benefit plans are not subject to the vesting provisions of ERISA, an employee can never accrue "vested" rights to severance pay benefits under ERISA.

## C. The Role of Federal Common Law

■ The dispositive issue therefore is whether, recognizing that ERISA does not prescribe the structure of or guarantee rights to an employer's severance pay plan, if the employer chooses to offer such a plan may the employer later terminate the plan without incurring liability for the previously promised benefits? The Court concludes that while welfare benefit plans are not subject to the elaborate vesting and participation provisions of ERISA, an employee nevertheless may acquire a *contractual* interest in such benefits, enforceable under federal common law.

■ Omission of welfare benefit plans from the vesting provisions of ERISA does not reflect Congressional intent that welfare benefit rights are entitled to no protection under federal law. An employer may not terminate such a plan with absolute impunity. *Cf. Northeast Department ILGWU Health and Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund,* 764 F.2d 147 (3d Cir.1985) (Westlaw) ("The decision of trustees to incorporate an escape clause in a benefit plan—through which the plan attempts to escape liability if a participant or beneficiary is covered by another plan—constitutes arbitrary and capricious conduct.") Congress intended to make the vesting provisions applicable solely to pension plans. The provisions are in response to myriad of problems encountered prior to ERISA's enactment, ranging from misadministration of pension funds to the loss of employee pension rights if an employee left or lost his job prior to retirement, or the employer become insolvent. H.R.Rep. No. 93–807, 93d Cong., 2d Sess. *reprinted in* 1974 U.S.Code Cong. & Admin.News 4670, 4719. The legislative history reflects that Congress' omission of welfare benefit plans from the vesting provisions of ERISA was based on a concern for containing the cost of pension plans and their ease of administration. *Id.* at 4935; *A–T–O, Inc. v. Pension Benefit Guarantee Corp.,* 634 F.2d 1013, 1021 (6th Cir.1980) (ERISA "is a finely tuned balance between protecting pension benefits for employees while limiting the costs to employers").[3]

established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—

 (A) provides retirement income to employees, or

 (B) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan. 29 U.S.C. § 1002(2).

**3.** In making its recommendation for the passage of the ERISA bill, the Senate Committee on Finance made the following observations concerning why welfare benefits were not included within the statute's vesting provisions:

 Accrued benefits.—Under the committee bill, the vested employee is protected in his rights to all, or a certain percentage, of his "accrued

ERISA's silence as to the legal status of severance pay rights creates a gap that must be filled by reference to federal common law.[4] The complexity of labor relations and the variety of wage and benefit arrangements possible between an employer and its employees make it inevitable that gaps will appear in ERISA's statutory regulation of employee benefit plans. "Congress intended that a body of Federal substantive law ... be developed by the court to deal with issues involving rights and obligations under private welfare and pension plans." 120 Cong.Rec. 29942 (1974) (remarks of Senator Javits).

This Court rejects the truism which has emerged in the wake of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), that is—there is not federal common law. While federal district court jurisdiction is narrowly circumscribed by statute, courts proceeding under federal question jurisdiction must often develop a body of federal common law to permit principled and consistent interpretation of federal statutes. The Supreme Court has recognized the propriety of district court formulation of federal common law to resolve issues arising under ERISA. Recently, in *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.*, —— U.S. ——, —————, 105 S.Ct. 2833, 2841–42, 86 L.Ed.2d 447 (1985), the Supreme Court held that trust beneficiaries had the right to inspect trust documents in scrutinizing a pension fund trustee's administration of the trust's assets. In defining the powers and duties of the trustee, the Court determined that Congress had enumerated only some of the trustee's duties and powers under ERISA, and in light of the broad "policy of assuring the equitable character of the plans," Congress intended to incorporate the common law of trusts—and for federal courts to draw on that source of law in reviewing the conduct of trustees. *Id.* And in a concurring opinion to the decision in *Massachusetts Mutual Life Insurance Co. v. Russell*, —— U.S. ——, ——, n. 18, 105 S.Ct. 3085, 3098, n. 18, 87 L.Ed.2d 96 (1985) (Brennan, J. concurring), Justice Brennan stated:

> "Where the courts are required themselves to fashion a federal rule of decision, the source of that law must be federal and uniform. Yet, state law where compatible with national policy may be resorted to and adopted as a federal rule of decision.... Here, of course, there is little federal law to which the court may turn for guidance. State regulation of insurance, pensions, and other such programs, however, provides a preexisting source of experience and experiment in an area in which there is, as yet, only federal inexperience. Much of what the states have thus far developed, particularly in the insurance field,

---

benefit." This term refers to pension or retirement benefits and is not intended to apply to certain ancillary benefits, such as medical insurance or life insurance, which are sometimes provided for employees in conjunction with a pension plan, and are sometimes provided separately. To require the vesting of these ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income. Also, where the employee moves from one employer to another, the ancillary benefits (which are usually on a contingency basis) would often be provided by the new employer, whereas the new employer normally would not provide pension benefits based on service with the old employer.
S.Rep. No. 93–383, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Congressional and Admin.News 4890, 4935.

**4.** A number of federal courts have reviewed similar fact situations to the one presented in the instant case. The holding in some of the cases has been to deny the severance pay claims on the ground that employees cannot accrue "vested" rights in welfare benefit plans under ERISA. *See e.g., Sly v. P.R. Mallory & Co.*, 712 F.2d 1209 (7th Cir.1983); *Dhayer v. Weirton Steel Division of National Steel Corp.*, 571 F.Supp. 316 (N.D.W.Va.1983) *aff'd sub nom., Sutton v. Weirton Steel Division of National Steel Corp.*, 724 F.2d 406 (4th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984). The Court believes that these decisions fail to adequately appraise the policies underlying ERISA—that is, to afford employees protection of their earned, but deferred and/or contingent benefits.

is statutory. In certain areas of public concern, the state legislatures have been quite active in enacting comprehensive regulatory schemes, and state statutory sources of law will no doubt play a major role in the development of a federal common law under ERISA, particularly in defining rights under employee benefit plans." *Wayne Chemical, Inc. v. Columbus Agency Service Corp.*, 426 F.Supp. 316, 325 (N.D.Ind.), modified on other grounds, 567 F.2d 692 (7th Cir. 1977).

In *Scott v. Gulf Oil Corp.*, 754 F.2d 1499 (9th Cir.1985), the court affirmed the district court's dismissal without prejudice of former employee's state law claims for breach of contract based on Gulf Oil's refusal to honor alleged promises to pay severance pay benefits upon the sale of one of its refineries. The employees filed suit in federal court on diversity of citizenship jurisdiction alleging state law claims for breach of contract. The Court dismissed the claims holding that ERISA preempted the state law causes of action. But, at the same time, the Court granted the plaintiffs leave to amend their complaint, directing the employees to raise their claims under ERISA.

> ERISA does not contain a body of contract law to govern the interpretation and enforcement of employee benefit plans. Instead, Congress intended for the courts, borrowing from state law where appropriate, and guided by the policies expressed in ERISA and other federal labor laws, to fashion a body of federal common law to govern ERISA suits.

*Id.* at 501–02.

The Ninth Circuit implied that although severance pay benefits are not enforceable as "vested" rights under ERISA, federal common law may provide a contractual basis for the enforcement of such rights.

D. *Sources of a Rule of Federal Common Law*

In formulating a federal rule of decision in this case, the policies underlying ERISA as reflected in the legislative history pro-
vide the primary source of guidance. Reference to state law decisions on fringe benefits also is particularly instructive. *Cf. Cattin v. General Motors Corp.*, 612 F.Supp. 948 (E.D.Mich.1985) (Westlaw) (denying motion for summary judgment on contract claim for wrongful denial of early retirement benefits, holding that insofar as ERISA preempts state contract law the Court will first look to ERISA to define the rights of the parties and when no protection is afforded under that statute, the Court may refer to the federal common law of contract guided by principles derived from state law); *Menhorn v. Firestone Tire & Rubber Co.*, 738 F.2d 1496, 1499 (9th Cir.1984).

A principle objective of ERISA is to safeguard the integrity of all employee benefit plans by establishing uniform standards that protect employee entitlements to such benefits from the exercise of arbitrary decisions of particular employers. Recognition of a federal common law contractual basis for enforcing the terms of welfare benefit plans—given their exclusion from the vesting and participation provisions under ERISA—is entirely consistent with the policies of ERISA and does not impose unreasonable costs or administrative burdens on the employer.

A district court in the Sixth Circuit recently considered the role of federal common law in determining the legal status of benefits conveyed by an employer under a welfare benefit plan. In *Hansen v. White Farm Equipment Co.*, 5 EBC 2130, 42 B.R. 1005 (N.D.Ohio 1984), *expedited appeal granted* (April 15, 1985), *suggestion of bankruptcy filed staying appeal* (June 24, 1985), the district court reversed a bankruptcy court's denial of welfare plan benefits to retiree petitioners. The Court referred to federal common law to determine the status and content of the retiree's rights under a comprehensive welfare benefit plan originally promised by their former employer. Retirees of the corporation had commenced the action under the Bankruptcy Act seeking retroactive reinstatement of welfare benefits, including life,

health and welfare insurance, following termination of the benefits by a successor corporation to the retiree's former employer. The Bankruptcy Court had entered summary judgment in favor of the employer, finding that Congress had expressly excluded welfare benefit rights from the vesting and participation standards of ERISA, 29 U.S.C. § 1051, and therefore excluded such benefits from the concept of "accrued benefits", 26 C.F.R. § 1103(1)(2), thereby permitting the corporation's unilateral termination of the retiree's rights.

In a well annotated opinion by Judge Aldrich the district reversed, holding that ERISA did not expressly exclude welfare benefit plans from ERISA's vesting provisions, but rather omitted mention of them creating a gap in the statutory protection of such rights and requiring reference to federal common law to aid the Court in interpreting the nature and enforceability of the rights. *Hansen*, 5 EBC at 2137–38, 42 B.R. 1005.

> The creation of a federal common law governing employee benefit plans not specifically regulated by ERISA may be implied, moreover, from the statutory scheme itself. Where state law is preempted and no specific federal provision governs, a court is forced to make law or leave a void where neither state nor federal law applies. In such a situation it is a reasonable inference that Congress intended some law, and therefore federal law, to apply...." "[T]he court concludes that the statutory scheme, as well as the legislative history of ERISA, support the "reasonable inference" that this Court is mandated to formulate and apply a federal rule of decision in this case."

*Id.* at 2139, 42 B.R. 1005, *quoting Wayne Chemical v. Columbus Agency Service Corp.*, 426 F.Supp. 316, 322 (N.D.Ind.), *aff'd and modified*, 567 F.2d 692 (7th Cir. 1977); *accord Holliday v. Xerox Corp.*, 555 F.Supp. 51, 55 (E.D.Mich.1982), *aff'd* 732 F.2d 548 (6th Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 294, 83 L.Ed.2d 229 (1984). ("[N]othing in ERISA indicates that Congress intended to make contracts

unenforceable. Rather, if the state law is preempted, then the contract must be construed in accordance with federal law, in this case the federal law of contract."); *cf. Teamsters Local 348 Health and Welfare Fund v. Kohn Beverage Co.*, 749 F.2d 315, 319 n. 5 (6th Cir.1984) ("[i]n actions arising under federal statutes, federal common law, rather than state law, controls with respect to the availability of the estoppel defense.").

Concluding that formulation of a federal rule of law was warranted, the *Hansen* Court considered the sources of common law, determining that reference should be made to the policies underlying ERISA and, where consistent with such policies, pre-ERISA state law on welfare and retirement benefits. *Hansen*, 5 EBC at 2140, 42 B.R. 1005. The Court found that the retirees had obtained a contractually enforceable right to their welfare benefits. *Id.* at 2141, 42 B.R. 1005. Refering to the welfare benefits in the context of a "pension" plan (but not as ERISA defines pension as a legal term of art), the Court stated:

> The modern view [is] that the promise of a pension constitutes an offer which, upon performance of the required service by the employee, becomes a binding obligation.

*Id.* at 2141, 42 B.R. 1005, *quoting Hoefel v. Atlas Tack Corp.*, 581 F.2d 1, 4 (1st Cir. 1978) *cert. denied*, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979).

This Court will analyze the plaintiff's claims as they arise under ERISA, considering the enforceability of the asserted rights referring to federal common law where appropriate.

### III. *Discussion*

A. *Plaintiffs Possess a Contractual Right to Severance Pay Benefits*

"The employer/employee relationship is contractual in nature." *Hamby v. Genesco, Inc.*, 627 S.W.2d 373, 375 (Tenn.App. 1981), *cert. denied*, (Tenn.1982). Fringe benefits offered under such an arrangement usually are not construed as mere gratuities, but as rights resulting from a

bargained for exchange. This Court therefore must consider whether the severance pay benefits at issue in this case are enforceable contractual rights and, if so, identify the source from which such rights arise.

To create a binding contract there must be a communicated offer and an acceptance of the offer, both of which supported by sufficient consideration. In this case, the offer of severance pay benefits was conveyed in Firestone's employee handbook, which provided that severance pay would be awarded if an employee either was unable to perform his job or because of a reduction in work force, and one had not yet qualified for early retirement. Salared Employees Handbook at p. H–3. The Firestone employees accepted Firestone's offer of the severance pay benefits by continuing to work for Firestone. In *Hamby v. Genesco, Inc.*, 627 S.W.2d at 375–76, the Tennessee Court of Appeals affirmed the chancellor's determination that provisions contained within the Genesco employee handbook constituted an offer that was accepted by the employees' continued employment with the firm and, as such, became a binding term of the employer/employee contractual agreement. Similarly, in *Simmons v. Hitt*, 546 S.W.2d 587, 592 (Tenn.App.), *cert. denied*, (Tenn.1976), the Tennessee Court of Appeals held that

unfunded pension and retirement plans[5] are not merely gratuities offered by the employer, but created legal rights upon the employees' notice that such benefits are being offered and the employees' performance of the terms necessary for acceptance. The *Simmons* court stated:

> We hold a non-contributing pension plan is not a gratuity. It is an offer of additional deferred compensation to the employee as an incentive toward continuing better service and loyalty; the offer is accepted by the employee remaining in the employment of the employer, which is sufficient consideration to support the employer's promise to pay the benefits and is therefore a contract enforceable by the employee.

*Id.* at 592, *quoting Johnson v. Mueller Co.* (1974) (Matherne, J., unreported). This Court holds that Firestone extended an offer of a severance pay plan to its employees which was accepted by each employee upon his or her continuing service with the company.[6] The plan was but one aspect of the employee's compensation.

Judicial pronouncements from other jurisdictions overwhelmingly support the plaintiffs' position that the provisions in the Firestone handbook constituted an offer that was accepted by each employee's continued employment for the company. *Dulany Foods, Inc. v. C.M. Ayers*, 220 Va.

---

5. Unfunded pension plan benefits are similar to severance pay benefits insofar as the employee is not required to contribute to any fund and acquires a right to such deferred income, usualy calculated on the basis of the employee's length of service with his employer.

6. The Court rejects any argument that may be made by Firestone that it should not be held liable for severance pay benefits calculated for the period prior to its promulgation of the severance pay policy. As the Court noted in *Anthony v. Jersey Central Power & Light Co.*, 51 N.J.Super. 139, 143 A.2d 762, 764–66 (1958):

> It makes no difference that the severance pay plan was promulgated after the plaintiffs had been employed for some time by defendant. Since the employment was always at will, any announcement of a change in or addition to compensation of the employees of any form followed by the continuance of the employees in employment constituted an effective and binding agreement at the new terms for the

services rendered thereafter. Consequently, once the defendant improved the terms of compensation for the plaintiffs' work by announcing the institution of the severance pay plan it must be assumed that plaintiffs were thereafter working for that benefit as much as for any other benefit or item of compensation held out to them as compensation by the employer.

*Accord Delaney Foods, Inc. v. Ayers*, 220 Va. 502, 260 S.E.2d 196, 201–02 (1979). The Tennessee Supreme Court recently affirmed the employment at will doctrine in *Clanton v. Cain-Sloan Co.*, 677 S.W.2d 441 (1984). Accordingly, Firestone is contractually obliged to honor its severance pay plan commitments to each employee based upon his years of service with the corporation up until the date of divestiture, even if the period of service extends back prior to Firestone's promulgation of its severance pay policies.

502, 260 S.E.2d 196, 200–03 (Va.1979) ("severance pay is a matter of contract between the parties ... [and a] promise [reflected in a personnel policy statement] amounts to an offer, which, if accepted by performance of the service, fulfills the legal requirements of a contract"); *Dahl v. Brunswick Corp.*, 277 Md. 471, 356 A.2d 221, 224 (1976) (awarding severance pay to employees of predecessor corporation despite continued employment with successor); *Willets v. Emhart Mfg. Co.*, 152 Conn. 487, 208 A.2d 546 (1965) (corporate personnel policy on severance pay deemed to have become part of understood employment agreement); *Chapin v. Fairchild Camera and Instrument Corp.*, 31 Cal.App.3d 192, 107 Cal.Rptr. 111, 114–15 (1973); *Adams v. Jersey Central Power & Light Co.*, 36 N.J.Super. 53, 71, 114 A.2d 776, *aff'd*, 21 N.J. 8, 120 A.2d 737 (1956); *Gaydos v. White Motor Corp.*, 54 Mich.App. 143, 220 N.W.2d 697, 700 (1974); *Dangott v. ASG Industries, Inc.*, 558 P.2d 379 (Okla.1976).

In sum, the Court finds that the plaintiffs in this case acquired a contractual right cognizable under federal common law to benefits under the Firestone severance pay plan. The rights are to a deferred and contingent benefit. The plan is subject to the procedural protections contained in ERISA, that is, reporting and disclosure requirements and fiduciary standards, but with substantive rights governed by common law contract principles.

B. *Provisions of the Confidential Personnel Manual are Not Binding Terms on the Firestone Employee Rights.*

■ The Court will look only to the employee handbook to construe the terms of the offer and will not consider the confidential Firestone's Salaried Personnel Manual. Although the Manual contains considerably more detail as to the severance pay plan, the fact that Firestone kept the Manual confidential from its employees demonstrates that its terms were not communicated to the employees and, therefore, its provisions were not part of the offer or the agreement.

Sound policy under ERISA also requires exclusion of the manual from the Court's consideration. ERISA mandates express reporting and disclosure procedures aimed at safeguarding employee interests by assuring that employees have adequate access to the terms and conditions affecting their rights to deferred income benefits. 29 U.S.C. § 1021–31. Firestone does not dispute that it failed to distribute the manual to its employees or that its personnel managers lacked any formal training or instruction as to the requirements of ERISA, and therefore, were unaware of their legal obligation to make such disclosures.

In light of Firestone's delinqencies, the Court finds it highly inequitable to give effect to those provisions contained in the confidential manual that would operate to limit the scope or amount of the plaintiff employees' severance pay benefits. For example, the Court gives no effect to an amendment to the Manual that denies severance pay to employees who refuse offers of comparable employment made by a purchasing corporation of a Firestone plant— in this case, Bridgestone.

■ During Firestone's negotiations with Bridgestone on the sale of the Lavergne facility, certain employees began raising questions with management personnel concerning their right to severance pay if the sale was consummated. In response, Firestone replied in writing that if such a contingency occurred present employees at the Lavergne facility would not be entitled to severance pay assuming they were offered equivalent positions with Bridgestone. The response was followed by Firestone's amendment to its confidential manual (of which the plaintiffs were given no notice) which provided:

**K Job-Offer Refusal.**

An employee whose job is eliminated and who refuses an offer "not involving a geographic relocation" of a position having at least the same grade level and paying at least the same salary will not be considered terminated as a resignation with no RIF payment or benefits; or, if eligible, employee may retire.

A modification of benefit rights contained in a confidential manual will not be given effect. *Dependahl v. Falstaff Brewing Corp.*, 491 F.Supp. 1188, 1196–97 (E.D.Mo. 1980) ("[a] change [in severance pay policies] is not permissible when made expressly in contemplation of actions which would otherwise entitle employees to the previously provided benefits."); *Calhoun v. Falstaff Brewing Corp.*, 478 F.Supp. 357, 360–61 (E.D.Mo.1979) (holding amendment of severance pay plan contemporaneous with negotiations for the sale of a plant facility constituted a clear violation of the employer's fiduciary duty under ERISA). Because the plaintiffs were not advised of the terms of the Manual or of the Manual's amendment, the provisions of the document are unenforceable and are not material to this Court's construction of the plaintiffs' substantive rights.

C. *Firestone's Failure to Comply with ERISA's Reporting and Disclosure Provisions Has Not Imposed a Substantive Harm on the Plaintiffs.*

■ ERISA requires Firestone to disclose and report to all employees a summary plan description of its severance pay policy and information relevant to coverage, claims procedures, amendments to the plan, and other information material to the employees' rights. 29 U.S.C. §§ 1021–1031. Firestone, while acknowledging that it failed to comply with ERISA's reporting and disclosure provisions, argues that its failure does not rise to the level of imposing a substantive harm upon the plaintiffs thereby entitling them to payment of their severance benefits. The Court agrees.

This case is distinguishable from the reporting violations found in *Blau v. Del Monte Corporation*, 748 F.2d 1348 (9th Cir.1985), in which the Ninth Circuit reversed the district court's award of summary judgment to the employer defendant who had denied payment of severance pay upon the sale of a plant as an ongoing concern. As in this case, the plaintiffs were nonunion, salaried employees who claimed that Del Monte's written, but confidential, severance pay policy manual constituted a violation of the employer's fiduciary duties to comply with the reporting and disclosure provisions of ERISA. The Ninth Circuit concluded that Del Monte had "flouted" ERISA's procedural provisions in such a wholesale and flagrant manner as to "alter the substantive relationship between the employer and the employee" thereby working a substantive harm probative of the fact the "Del Monte's denial of severance pay benefits was arbitrary and capricious." *Id.* at 1354. *See also Gilbert v. Burlington Industries, Inc.*, 765 F.2d 320 (2d Cir.1985), (Westlaw), (adopting *Blau* standard of review for reporting violations but deferring decision on the merits to district court determination); *Anderson v. Ciba-Geigg Corp.*, 759 F.2d 1518, 1520 (11th Cir.1985).

*Blau* establishes a very high threshold for determining arbitrary and capricious conduct *vis-a-vis* noncompliance with ERISA's procedural requirements. Accepting all the plaintiffs' allegations as true, this Court concludes that Firestone's conduct is not so culpable as to satisfy the *Blau* threshold. In *Blau*, the employer kept all aspects of the severance pay plan confidential and refused to disclose a claims procedure by which employees could seek severance pay benefits. The Court found that the procedural violations were so pervasive as to demonstrate the employer's bad faith. In this case, the Court finds that while Firestone is culpable for certain procedural irregularities, the failure the comply with ERISA is not flagrant and pervasive; therefore, of itself not sufficient to warrant a finding that Firestone acted arbitrarily and capriciously in denying severance pay benefits.

D. *Firestone Did Not Breach its Fiduciary Duties By Denying the Plaintiffs' Requests for Severance Pay Benefits.*

An employer who maintains a welfare benefit plan offering severance pay benefits to its employees is subject to the statutorily prescribed fiduciary standards of care in its administration of the plan. 29

U.S.C. § 1101.[7] The plaintiffs in this case have a federal common law right to the deferred and contingent benefit of severance pay. The next question this Court must consider is whether Firestone, as administrator of the plan, violated its fiduciary duty by denying the plaintiffs' requests for payment of severance pay benefits.

1. *Judicial Deference to an Employer's Administration of an Employee Benefit Plan.*

 Defendant Firestone asserts that well-established federal case law precedent upholds its denial of payment and that, as a matter of law, an employer/administrator is never under an obligation to pay severance pay benefits upon the sale of an ongoing operation when its former employees immediately are employed by the successor corporation without any significant loss in earnings or benefits. *See Sly v. P.R. Mallory & Co.,* 712 F.2d 1209 (7th Cir.1983); *Sutton v. Weirton Steel Division of National Steel Corp.,* 724 F.2d 406 (4th Cir. 1983), *cert. denied* — U.S. ——, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984). The Court believes defendant's position is too broad; each case must be judged on its own merits, such that the decision to deny severance pay must be analyzed in view of the terms of the welfare benefit plan and the contingencies that the claimants argue give rise to an obligation to pay. *Livernois v. Warner-Lambert Co., Inc.,* 723 F.2d 1148, 1151–52 (4th Cir.1983); *Pinto v. Zenith Radio Corp.,* 480 F.Supp. 361, 363–64 (N.D.Ill. 1979), *aff'd* 618 F.2d 110 (7th Cir.1980) (severance pay is not automatic, but must be determined on a case-by-case basis).

 The Court concludes that while certain evidence demonstrates culpable conduct on the part of Firestone in administering the severance pay plan, its decision to deny the plaintiffs' request for severance pay benefits did not violate its fiduciary duties under ERISA. Federal courts extend great deference to the administrator of a welfare benefit plan, and will not vacate an administrator's decision unless such action is shown to be arbitrary and capricious, or made in bad faith. *Jung v. FMC Corp.,* 755 F.2d 708 (9th Cir.1985); *Blau v. Del Monte Corp.,* 748 F.2d 1348 (9th Cir.1985). Certain circumstances, however, may warrant a more searching review by the Court. In *Jung,* the Ninth Circuit affirmed the district court's award of summary judgment to the defendant employer, upholding the employer's refusal to pay severance pay benefits upon the sale of a plant as an ongoing concern. But in reviewing the employer's denial, the court noted: "[w]here, as here, the employer's denial of benefits to a class avoids a very substantial outlay, the reviewing court should consider that fact in applying the arbitrary and capricious standard of review. Less deference should be given to the trustee's decision." During the hearing in this case, defense counsel estimated the potential liability of Firestone on the severance pay plan to be approximately $2–2.5 million. Hence, while this Court applies the arbitrary and capricious standard in this case, it notes that the substantial potential liability prompts a closer review of the facts as presented by the parties.

In reviewing Firestone's denial of benefits to the plaintiffs, the Court will consider two principal factors in assessing whether Firestone has discharged its fiduciary obli-

7. ERISA defines the employer/administrator's fiduciary duties as follows:
 [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
 (a) for the exclusive purpose of:
 (i) providing benefits to participants and their beneficiaries; and
 (ii) defraying reasonable expenses of administering the plan;
 (b) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; and
 (d) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter or subchapter III of this chapter.
 29 U.S.C. § 1104(a)(1).

gations to the plaintiffs: (1) the express terms of the severance pay plan, and (2) Firestone's past practices at other plant facilities with regard to payment of severance pay benefits. *See* 29 U.S.C. § 1104(a)(1)(B) (defining the execution of an administrator's fiduciary duty as careful and diligent action in accordance with documents and instruments governing the plan).

### 2. *Defining "Reduction in Force"*

The employee handbook states that termination pay shall be made in the event that Firestone imposes a "reduction in force" involuntarily terminating the employment of a particular worker. Plaintiffs maintain that upon the sale of the Lavergne plant, Firestone imposed a reduction in force terminating the employment of its salaried employees. The confidential personnel manual defines "reduction in force" as an involuntary termination of employment due to "reduced work load or economic necessity." Personnel Manual at 1.5 (Feb. 2, 1982 rev.) (Exhibit A, Deposition of Thomas Robinson, filed November 14, 1984).[8] The Court finds the concepts of "reduced work load" or "economic necessity" to provide little guidance in defining the term "reduction in force."

The Court therefore considers case law pronouncements involving similar facts as they define the term "reduction in force." In *Trotter v. Amalgamated Association of Street Electric Railway and Motor Coach Employees of America*, 309 F.2d 584, 586 (6th Cir.1962), the Sixth Circuit Court of Appeals stated without explanation that a "reduction in the forces of labor" did not occur upon the sale of suburban bus lines between two bus operators. The Court therefore denied union employees requests for enforcement of benefits under a collective bargaining agreement that would have been triggered by a reduction in force. In *Dhayer v. Weirton Steel Division of National Steel Corp.*, 571 F.Supp. 316, 330

(N.D.W.Va.1983), the district court held that nonunion salaried employees were not entitled to severance pay benefits solely on the basis of a transfer of ownership because "the fundamental bases for this benefit [were] not necessarily put into play by such a transfer of ownership; namely, the permanent abolishment of positions or reductions in the salaried work force." In that case, the court held that the immediate reemployment by the successor corporation precluded a finding of a reduction in the work force thereby triggering the right to severance pay.

■ This Court agrees with the approach taken by a majority of the federal courts facing similar fact situations; that is, continued employment with a successor corporation following the transfer of ownership, although characterized by a termination of employment with the predecessor corporation, does not constitute an involuntary reduction in work force by the predecessor corporation thereby entitling the employees to severance pay benefits.

### a. *Firestone's Past Practices*

At the outset, the Court notes that the parties are in sharp disagreement as to the appropriate characterization of Firestone's past practices. Nevertheless, the Court finds that the dispute between the parties as to the interpretation of these practices is not a material issue precluding summary judgment at this time. In light of the deferential standard (arbitrary and capricious) of review, past practice will be probative of a violation of an employer's breach of fiduciary duty only to the extent that the challenged conduct departs radically from the employer's pattern of conduct in the past. In this case, taking plaintiffs' allegations as true, plaintiffs nevertheless fail to demonstrate that Firestone's denial of severance pay at the Lavergne facility

---

**8.** As discussed above, the Court will not consult the confidential personnel manual to obtain guidance to the extent that such substantive information would compromise the rights of the Firestone employees. In this situation, however, the definition of reduction in force is relatively neutral, indeed ambiguous, and provides little guidance to the Court in defining the meaning of the term.

constituted a significant departure from prior conduct under similar circumstances.

Plaintiffs point to Firestone's payment of monies at the Conover, North Carolina facility and at the Arlington, Texas facility as illustrative of Firestone's payment of severance pay in similar circumstances. While the Court, at this point of the proceeding, is not in a position to determine the actual nature of the sales of the facilities, the depositions and affidavits submitted with the motions in this case do demonstrate that the factual settings were somewhat different at each of these facilities.

At the Conover, North Carolina facility Firestone paid a "service recognition award" to former employees. In that situation, Firestone divested itself of a facility to a successor corporation who offered significantly reduced wages and benefits to the former Firestone employees. Plaintiffs maintain that this "service recognition award" was calculated at the same rate the severance pay benefit and, therefore, is merely a matter of semantic characterization to cover up Firestone's payment of severance pay in a similar circumstance. In this case, although Bridgestone does not offer severance pay, its salary and benefits are comparable to those previously provided by Firestone.

At the Arlington, Texas facility, Firestone sold its assets to another corporation, but did not sell its facility as an ongoing concern without an interruption in actual production at the facility.[9] The Court finds that even though certain payments were made at other facilities the factual settings differ sufficiently enough for the Court to conclude that Firestone did not radically depart from prior practices in denying severance pay at its Lavergne facility and, therefore, did not act arbitrarily in denying payments.

### E. Firestone's Continuing Liability

■■ Firestone is subject to a continuing, contingent liability for severance pay in the event that Bridgestone finds it necessary to terminate one of the former Firestone employee/plaintiffs for reasons specified under the Firestone termination pay plan. The plaintiffs in this case possess an inchoate right to the deferred benefit of severance pay plan contingent upon a termination because of a reduction in force or an inability to perform one's work responsibilities, as set forth under the terms of the Firestone employee handbook.

The Court deems this arrangement the most fair and just and concludes that despite the fact that Firestone is no longer

---

**9.** Additionally, Firestone distinguishes Arlington from the Lavergne facility claiming that in the Bridgestone sale Firestone ardently negotiated with Bridgestone to save the jobs and received a contractual commitment by Bridgestone that the employees would remain in their positions. Firestone maintains that this conduct is relevant to the issue of their good faith. The Court rejects this notion. In *Livernois v. Warner-Lambert Company, Inc.*, 723 F.2d 1148, 1151 n. 5 (4th Cir.1983), the Court considered the relative merit of the defendant employers negotiation of assurances that the successor corporation would employ the defendant's former employees.

> Some needless energy has been expended in jousting whether Warner-Lambert was displaying the traits of a benevolent and enlightened employer or had solely selfish personal aggrandizement in mind. Of course, smoothing the way of employees by actively securing for them continued employment without diminution of benefits was a commendable step on Warner-Lambert's part. At the same time, the purchase price for the medical-surgical Division was probably enhanced by a step

> designed to reassure the purchaser that the change of ownership would be accomplished with a minimum of interruption of continuity or dislocation of production. "It is a matter of common knowledge that the most valuable attraction a manufacturing plant can offer a prospective purchaser is a well-trained, efficient, loyal and contented group of employees." *Dulaney Foods, Inc. v. Ayers*, 220 Va. 502, 508, 260 S.E.2d 196, 200 (1979).

> In short, what Warner-Lambert did was good for everyone concerned, itself included. Judgmental considerations of "good" and/or "bad" simply are not appropriate.

Similarly, in this case, Firestone was divesting itself of a highly technical production facility that had significantly greater value as a producing operation as compared to its value based solely on the worth of the machinery and equipment contained in the buildings. It would seem that Bridgestone, in deciding to purchase the facility, would be acutely interested in obtaining a work force qualified to operate the specialized equipment of the plant.

the employer, it is within this Court's equitable power to declare that Firestone remains primarily liable on its contractual obligations even though Bridgestone is now the entity capable of triggering the contingency that would result in the severance pay obligations coming due. A similar declaration of rights holding the predecessor corporation responsible for contingent severance pay benefits was made in *Livernois v. Warner-Lambert Co., Inc.*, 723 F.2d 1148, 1155–57 (4th Cir.1983) (applying state law).

The sale of the Lavergne facility to Bridgestone did not terminate the plaintiffs enforceable contract right to such welfare benefit; rather, it merely established the end date to which the amount of severance pay would be calculated on—that is, from the date on which the employee started with Firestone until the date on which Firestone sold the Lavergne facility to Bridgestone. No danger of "double dipping" is presented under the current facts; Bridgestone does not offer a severance pay plan, and even if it did, assuming its calculation for benefits followed the same formula as that used by Firestone, the amount of severance pay would be based on a calculation dating from its purchase of the Lavergne facility until the time of the termination. Equity is served by this decision. Neither the plaintiffs nor the defendant shall enjoy a windfall nor suffer a forfeiture—the plaintiffs shall not receive a lump sum in view of their continued employment with Bridgestone and Firestone will not be relieved of a contingent liability solely because it has disassociated itself from its former employees.

### IV. *Conclusion*

The Court recognizes the enforceable contractual right of the former Firestone employees, but holds that no contingency has yet occurred giving rise to a maturation of the right to payment of the severance benefits. Because Firestone has not breached its fiduciary duty in denying a valid request for payment, the Court denies the plaintiffs' request for relief and will not order payment on the severance pay plan.

However, assuming that a former Firestone employee is terminated by Bridgestone because of a reduction in force or other contingency specified in the Firestone Employee Handbook, that employee would have the right to request payment from Firestone of their earned, deferred benefit. The decision today does not prevent a terminated, former Firestone employee from suing in federal court to enforce his or her rights. Firestone currently administers pension plans and welfare benefit plans and therefore has sufficient expertise and resources to assure the proper discharge of its statutory duties as to the contingent liabilities in this case.

The Court therefore grants Firestone's motion for summary judgment.