MARTIN MARIETTA CORPORATION

v.

The BENDIX CORPORATION.

Civ. No. Y–82–2560.

United States District Court,
D. Maryland.

Sept. 16, 1982.

George Beall, James R. Eyler, and Mark D. Gately, Baltimore, Md., for plaintiff Martin Marietta Corp.

Marc Cherno, New York City, John H. Lewin, Jr., Benson E. Legg, Baltimore, Md., and Gerald Goldman, Washington, D. C., for defendant The Bendix Corp.

## MEMORANDUM OPINION AND ORDER

JOSEPH H. YOUNG, District Judge.

Martin Marietta, a Maryland corporation, brought this action alleging that Bendix made misrepresentations and omissions in its disclosure materials filed in connection with Bendix' tender offer for Martin Marietta in violation of the Williams Act and accordingly asks this Court to issue a preliminary injunction against the continuance of Bendix' tender offer until such time as Bendix has cured its alleged disclosure violations.

*The Three Tender Offers*

On August 25, 1982, Bendix announced a tender offer for approximately 44.5% of Martin Marietta's common stock at a price of $43 per share.[1] On September 7, Bendix increased its offer to $48 per share, and on September 10, Bendix stated that it would purchase approximately 55% of Martin Marietta's common stock.[2] If Bendix succeeds

---

1. From April 12, 1982 to July 29, 1982, Bendix purchased just under 5% of Martin Marietta's common stock. By limiting its purchases to less than 5%, Bendix did not have to comply with the disclosure requirements of the Williams Act. 15 U.S.C. § 78n(d)(1).

2. The proration period of Bendix' tender offer expired at midnight September 4. Bendix subsequently announced that as of that deadline approximately 58% of Martin Marietta's common stock had been tendered to it.

with its tender offer, it intends to acquire all of the remaining Martin Marietta shares through a squeeze-out merger. The withdrawal deadline for Bendix' offer is midnight September 16—*i.e.,* at that time Martin Marietta's shareholders who tendered their stock may no longer take back their stock and Bendix may proceed to purchase the stock tendered to it.

On August 30, five days after Bendix announced its tender offer, Martin Marietta countered with a tender offer for approximately 50.3% of Bendix' common stock at a price of $75 per share.[3] The withdrawal deadline for Martin Marietta's offer is midnight September 22.

United Technologies Corporation jumped into the fray on September 7 with its tender offer for approximately 50.3% of Bendix' common stock at a price of $75 per share. On September 15, United Technologies increased its offer to $85 per share. The withdrawal deadline for United Technologies' offer is midnight September 28.

All three tender offers can be aptly, if somewhat understatedly, described as "hostile." The board of directors of Martin Marietta voted unanimously to recommend to its shareholders that they reject the Bendix offer because it is inadequate and not in the best interests of Martin Marietta shareholders. With equal unanimity, Bendix' board of directors voted to reject both the Martin Marietta offer and the United Technologies offer.[4] In addition to the litigation in this Court,[5] the three corporations have

battled each other in other federal and state courts, on Wall Street and through the media.

*The Williams Act*

The Williams Act, enacted in 1968 as an amendment to the Securities Exchange Act of 1934, was designed to close a significant gap in the disclosure requirements of the federal securities laws by requiring an offeror to make full and fair disclosure to shareholders faced with a tender offer so that informed investment decisions can be made. *Edgar v. MITE Corp.,* —— U.S. ——, ——, 102 S.Ct. 2629, 2635, 73 L.Ed.2d 269 (1982). The "sole purpose of the Williams Act was the protection of investors." *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977). It was enacted to ensure that investors "will not be required to respond [to a tender offer] without adequate information." *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2075–2076, 45 L.Ed.2d 12 (1975).

Two provisions of the Williams Act are pertinent to this litigation. Section 14(d), by incorporating Section 13(d) by reference, requires a tender offeror to disclose the following information:

> [I]f the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other

---

**3.** The proration period of Martin Marietta's tender offer expired at midnight September 9. By that time approximately 75% of Bendix' common stock had been tendered to Martin Marietta.

**4.** Bendix' board of directors has not yet commented on United Technologies's offer of $85 per share. Some securities analysts believe the $85 per share offer might be acceptable to Bendix' directors. *See The Baltimore Evening Sun,* September 15, 1982, § D, at 11.

**5.** The intensity of the battle among the three corporations is manifested by the actions filed

in this Court during the past three weeks. On August 25 Bendix brought suit to enjoin the Maryland Corporate Take-Over Law. On August 30 Martin Marietta brought this action. On September 3 Bendix filed a counterclaim alleging that Martin Marietta's tender offer is illegal. On September 7 United Technologies asked this Court to declare its tender offer legal under the Clayton Act and to enjoin Bendix from passing amendments to its corporate charter allegedly designed to frustrate tender offers for Bendix. On September 11, in a rare Saturday filing, Bendix counterclaimed against United Technologies alleging that its tender offer violated the antitrust laws.

change in its business or corporate structure.

15 U.S.C. § 78m(d)(1)(C).[6]

Section 14(e) is a broad anti-fraud provision which states:

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer.

15 U.S.C. § 78n(e). The test used in determining whether a fact is "material" under Section 14(e) was enunciated in *TSC Industries, Inc. v. Northway,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).[7] There the Supreme Court stated:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote ... Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.

*Disclosure of Plans or Proposals to Divest Martin Marietta's Non-Aerospace Divisions.*

In its Offer to Purchase, sent to all Martin Marietta shareholders pursuant to Securities and Exchange Commission Rule 14d–6, 17 C.F.R. § 240.14d–6, Bendix stated:

> [T]he Purchaser [Bendix] has conducted studies, on the basis of publicly available information, of alternative business strategies that it might consider under varying economic and market conditions in

the event it acquires all or substantially all of the equity interest in the Company [Martin Marietta]. In this regard, the Purchaser has analyzed the possibility of divesting one or more of the non-aerospace divisions of the Company, but the Purchaser has made no determination to pursue any such transaction and has no plan or proposal with respect thereto.

Similarly, on August 27, Bendix issued a press release stating that "it has no plans to divest any of Martin Marietta's operations following a merger of the two companies" and that "press reports to the contrary were erroneous." [8]

Martin Marietta alleges that the above statements by Bendix are false and were calculated to mislead Martin Marietta's shareholders and the investing public. Martin Marietta claims that, contrary to Bendix' statements, Bendix does have post-acquisition plans or proposals to divest Martin Marietta's non-aerospace divisions and, therefore, Bendix made misrepresentations and omissions in violation of Sections 14(d) and 14(e).

Martin Marietta's non-aerospace divisions —cement, aluminum, chemicals, and construction aggregates—accounted for 42% of Martin Marietta's 1981 sales. While Bendix' aerospace operations complement Martin Marietta's aerospace operations, Bendix does not do any business in any of the areas of Martin Marietta's non-aerospace divisions.

In support of its allegations that Bendix does have plans and proposals to divest Martin Marietta's non-aerospace divisions, Martin Marietta marshalled the following evidence that it obtained during ten days of expedited discovery:

---

**6.** It is undisputed that the purpose of Bendix' tender offer is to acquire control of Martin Marietta.

**7.** Though *TSC Industries* was a Section 14(a) case, its definition of materiality has been applied to Section 14(e). *See, e.g., Piper v. Chris-Craft Industries, Inc., supra,* 430 U.S. at 50, 97 S.Ct. at 953–954 (concurring opinion of Blackmun, J.); *Seaboard World Airlines, Inc. v. Tiger International, Inc.,* 600 F.2d 355, 360–61 (2nd

Cir. 1979); *Whittaker Corp. v. Edgar,* 535 F.Supp. 933, 945 (N.D.Ill.1982); *Riggs National Bank v. Allbritton,* 516 F.Supp. 164, 172 (D.D.C.1981); *Valente v. Pepsico, Inc.,* 454 F.Supp. 1228, 1238–39 (D.Del.1978).

**8.** Bendix filed its August 27 press release as an amendment to its Securities and Exchange Commission filings.

1. Statements made by Bendix Chairman William Agee in January, 1981, that the "companies we will be looking at will have a good technological fit;" that Bendix "will not go into anything that is very far afield from what Bendix currently does;" and that Bendix "would undertake a rationalization process" if it acquired a company that had some businesses that fit with Bendix and others that did not. Statements by Bendix personnel to its financial advisors at Salomon Brothers that Bendix wanted to acquire "a company that fit its strategic plans of being involved in basic businesses with high technology orientation." As evidence that these statements were put into action, Martin Marietta points to Bendix' 1981 divestment of its forest products business and its interest in a company, ASARCO, Inc., that is in the metals business.

2. An unsigned handwritten internal Bendix document, dated September 17, 1981, stating that if Bendix acquires Martin Marietta, it will "Probably spin out aluminum, aggregates at right time."

3. Six internal Bendix documents prepared by the staff of Bendix Vice-President for Corporate Development, K. Larry Hastie, reflecting Bendix' possible acquisition of Martin Marietta. Significantly, Hastie has responsibility for acquisitions and divestitures. The first of these documents, dated September 30, 1981, states that an initial assessment indicates that "Non-aerospace activities would have to be divested" and "Non-aerospace will have to remain stand-alone until sold." The second document, dated October 12, 1981, states that the "Relationship of Martin Marietta's other businesses (aluminum, chemicals, cement, aggregates) to our possible strategic objectives [is] not too clear." The same document states that "Selling non-aerospace [is] likely to require time and patience in order to realize full asset value potential" and that Bendix would have to "put up with" a lower return on investment "until it disposed of some or all of the non-aerospace businesses." The third document, dated October 19, 1981, describes Martin Marietta's non-aerospace businesses as "unattractive" but discounts this because of "our track record of divestments." The fourth document, dated July 22, 1982, states that "The non-aerospace businesses are likely candidates for divestments" and that divestment of Martin Marietta's aluminum business is "urgent." The fifth document, dated July 30, 1982, states that Martin Marietta would be a "lovely fit" with Bendix and "we would probably want to sell Marjorie's [code name for Martin Marietta] non-aerospace businesses." The last of these documents, dated August 5, 1982, characterized Martin Marietta's aluminum business as a " 'cash trap' that cannot easily be liquidated."

4. A memorandum written by Bendix Chief Financial Officer Donald Kayser to William Agee, dated August 5, 1982, which contained a predicted 1983 financial statement for the combined firm of Bendix and Martin Marietta after the divestiture of Martin Marietta's non-aerospace divisions. The memorandum also states that one of the advantages of a cash-equity offer over an all cash offer was that it permitted "divestitures at the pleasure" of Bendix.

5. Three internal Bendix documents and three internal Salomon Brothers documents which contain references to the possibility of divesting Martin Marietta's aluminum business. One of the Bendix documents states that Bendix will be "hard pressed to get anything near book on a sale" of the aluminum divisions. A handwritten Salomon Brothers document indicates that one of the subjects discussed at a July 27, 1982 meeting between Ben-

dix personnel and Salomon Brothers personnel was "What can we do with aluminum?" Other Salomon documents state that a "spin-off" of the aluminum business is "desirable" and could help maintain Bendix' high credit rating.

Martin Marietta argues that this evidence constitutes an unmistakable and consistent record that, in making its offer for Martin Marietta, Bendix seeks to acquire only the high technology, aerospace parts of Martin Marietta's business, and plans to divest the non-aerospace parts.

Bendix, on the other hand, submitted the following materials and arguments in support of its position that it does not have any plans or proposals to divest Martin Marietta's non-aerospace divisions:

1. Statements by Bendix' top management that diversification is one of the principal elements of Bendix' acquisition strategy. In Bendix' 1981 Annual Report, Chairman Agee stated that Bendix' acquisition program "is directed toward major businesses which could provide additional dimensions to the company." Similarly, Bendix General Counsel Harold Barron stated in the summer of 1981 that an acquisition "should not be in one of our existing three business areas—diversity is appropriate and indeed desirable." Bendix President McDonald also stated in October, 1981, that Bendix was looking for "corporate reconfigurations" involving "one or more new legs for [the] future." In addition, Bendix points to the fact that in the past it has considered acquisitions of other companies involved in the same businesses as Martin Marietta's non-aerospace divisions. In fact, in 1981 Bendix made a major acquisition in the metalworking industry by purchasing Warner & Swasey Company. Bendix also emphasizes that it has two large business segments aside from aerospace—automotive and industrial.

2. The documents prepared by members of Hastie's staff were no more than preliminary analyses prepared "on a basis that further work will generally be required to make significant decisions." These documents could not and do not represent the determination of Bendix for several reasons. First, the documents were prepared by staff members who had absolutely no role in the decision to acquire Martin Marietta. Indeed, Hastie himself took no part in the decision to acquire Martin Marietta. Second, Bendix President Alonzo McDonald, who saw some of the documents, viewed them as no more than statements of individuals' opinions and rejected them as any basis for supporting divestitures. Third, none of the documents were ever presented or disclosed to Bendix' board of directors. Fourth, read in context, none of the documents represent even a firm position on the part of the documents' authors regarding the divestment of Martin Marietta's non-aerospace divisions. In fact, many of the documents comment favorably on the possibility of Bendix' retaining Martin Marietta's non-aerospace divisions.

3. The memorandum by Chief Financial Officer Kayser which contained a predicted 1983 financial statement for the combined firm of Bendix and Martin Marietta after the divestiture of Martin Marietta's non-aerospace divisions was written in connection with a proposal Bendix was considering at that time, later rejected, of an "all cash" acquisition for Martin Marietta. An all cash tender offer would have required Bendix to seek outside sources of cash, most, if not all, of which could be obtained by divesting Martin Marietta's non-aerospace divisions. On the other hand, a cash-equity offer, such as the one Bendix did make for Martin Marietta, could be financed out of Bendix' available cash.

4. The Bendix and Salomon Brothers documents referring to the possible divestiture of Martin Marietta's aluminum divisions reflect nothing more than discussions of the currently depressed aluminum industry and possible alternative courses of action if Bendix does acquire Martin Marietta.

5. The documents submitted to the Bendix board of directors at the meeting where the offer for Martin Marietta was approved make no mention of plans or proposals to divest Martin Marietta's non-aerospace divisions. To the contrary, these documents contain several statements which assume that all of Martin Marietta's divisions will be retained after the acquisition. At the meeting Chairman Agee specifically said that Martin Marietta's aluminum and cement businesses were potentially "a positive factor." And, in response to a question about possible divestiture, Agee responded that "there was no reason for us to consider divestiture."

6. All Bendix personnel who were deposed during expedited discovery testified that Bendix had no plans or proposals for a post-acquisition divestiture of Martin Marietta's non-aerospace divisions. When Agee was asked about the documents prepared by Hastie's staff, he said "I recall my conclusion . . . . It didn't make sense for any divestiture." Bendix President McDonald answered a similar question by saying "it was clear from my point of view that we had no basis to make any such decisions and consequently that our decision should be that there would be no plan and no proposal for divestment." Bendix Chief Financial Officer Kayser testified that "there was absolutely no need to sell any assets if we had a cash and equity offer" and that a sale of Martin Marietta's aluminum business would result in "a negative impact on earnings and a substantial but unnecessary lowering of debt ratio."

7. The testimony of Jay Higgins of Salomon Brothers that Bendix "did not want us to pursue any serious analysis of divestiture or spin-offs as they were comfortable with the idea of keeping all of the businesses of Martin Marietta intact after the business combination."

*Preliminary Injunction Standard*

The Fourth Circuit has established a four-part standard governing preliminary injunctions. In *North Carolina State Ports v. Dart Containerline,* 592 F.2d 749, 750 (4th Cir. 1979), the court stated this standard as follows:

> [I]n this circuit the trial court standard for interlocutory relief is the balance-of-hardship test. Four factors enter into the determination of whether to grant or withhold interim relief: (a) plaintiff's likelihood of success in the underlying dispute between the parties; (b) whether plaintiff will suffer irreparable injury if interim relief is denied; (c) the injury to defendant if an injunction is issued; and (d) the public interest.

The court also addressed the appropriate weight to be given to these four factors:

> There is a correlation between the likelihood of plaintiff's success and the probability of irreparable injury to him. If the likelihood of success is great, the need for showing the probability of irreparable harm is less. Conversely, if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify issuance of the injunction. Of all the factors, the two most important are those of probable irreparable injury to the plaintiff if an injunction is not issued and likely harm to the defendant if an injunction is issued. If, upon weighing them, the balance is struck in favor of plaintiff, a preliminary injunction should issue if, at least, grave or serious questions are presented.

*Harm to Martin Marietta*

Since the key to the preliminary injunction standard is the balance of hardship, the

Court turns first to that issue. Martin Marietta says that it will suffer irreparable harm in two respects if a preliminary injunction is not issued a Bendix' tender offer. First, it argues that it will be harmed if its shareholders are required to decide whether to tender their shares based on Bendix' misstatements and omissions. Second, it argues that it will be harmed, even if it should ultimately prevail on the merits of its claims, because it will be impossible to restore the parties to the same position they would have been in absent the consummation of Bendix' tender offer. Neither of these arguments is persuasive in light of the facts of this case.

As will be discussed later, the evidence, considered as a whole, shows that Bendix does not have firm plans to divest Martin Marietta's non-aerospace divisions.[9] Nor does the evidence conclusively show that Bendix currently is considering proposals to divest these divisions. It is, however, the view of this Court that, although Bendix did not violate Sections 14(d) and 14(e), it could have made a more detailed disclosure of its intentions regarding Martin Marietta's non-aerospace divisions. Bendix' disclosure statements should have been more in line with those made by the offeror in *Grumman Corp. v. LTV Corp.,* 527 F.Supp. 86, 101–102 (E.D.N.Y.), *aff'd on antitrust grounds,* 665 F.2d 10 (2nd Cir. 1981). In that case the offeror, LTV, disclosed that:

> Following completion of the Offer, LTV intends to conduct a complete review together with Company management of all of the Company's operations and will not make a final determination as to whether or not to carry out any such disposition until after the completion of such review. It is not expected that any such dispositions would take place before the consummation of the merger

or other business combination transaction described above.

However, even if Bendix had made such a disclosure, it is most unlikely that it would have affected the decisions of any of Martin Marietta's shareholders to tender, or not to tender, their shares to Bendix. *See* Easterbrook and Fischel, "The Proper Role of a Target's Management in Responding to a Tender Offer," 94 *Harv.L.Rev.* 1161, 1171 (1981). ("Most shareholders are passive investors seeking liquid holdings. They have little interest in ... learn[ing] the details of management.") It necessarily follows that Martin Marietta's shareholders would not be harmed if an injunction is not issued.

While there is no denying that "once a tender offer has been consummated, it becomes difficult and sometimes virtually impossible for a court to 'unscramble the eggs,'"[10] *Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2nd Cir. 1970), this fact alone does not amount to a showing of irreparable harm to a target company if a preliminary injunction is not issued. This is particularly true where, as here, Bendix' tender offer is legal and an injunction would at the very least delay the offer and might possibly kill it forever. *See Edgar v. MITE Corp.,* —— U.S. at ——, 102 S.Ct. at 2638 (policy of Williams Act is to avoid delays that might harm the chances of success of tender offers). In short, it is quite clear that far from suffering irreparable harm if an injunction is not issued, Martin Marietta would suffer little or no significant harm.

*Harm to Bendix*

In sharp contrast to the absence of any real harm that Martin Marietta would suffer if an injunction is not issued is the irreparable harm that would be imposed on Bendix if an injunction is issued. In the usual tender offer situation, a delay of sev-

9. Indeed, at a hearing on this matter held in the afternoon of September 15, Martin Marietta's counsel candidly conceded this point.

10. This Court is well-acquainted with Judge Friendly's admonition that "in administering § 14(d) and (e), district judges would do well to ponder whether, if a violation has been sufficiently proved on an application for a tempo-

rary injunction, the opportunity for doing equity is not considerably better than it will be later on. The court will have a variety of tools usable at that stage." *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 947 (2nd Cir. 1969). *Accord, Piper, supra,* 430 U.S. at 42, 97 S.Ct. at 949–950.

eral days or a week to require an offeror to cure its disclosure defects could result in the temporary or even permanent lost opportunity to acquire the target company. *See Pargas, Inc. v. Empire Gas Corp.,* 423 F.Supp. 199, 209 (D.Md.), *aff'd per curiam,* 546 F.2d 25 (4th Cir. 1976). However, in this case certain factors pose even greater risks of harm to Bendix, which is the target company in tender offers made by Martin Marietta and United Technologies which go into effect on September 23 and September 29, respectively.

This Court cannot turn away from the fact that an injunction against Bendix' tender offer would probably result in Bendix itself being acquired by a hostile offeror. An injunction against Bendix' offer would dramatically tip the scales in favor of Martin Marietta and United Technologies. The denial of a preliminary injunction preserves the *status quo* and permits the three antagonists to continue their struggles according to their own self-imposed timetables.

*Likelihood of Success on the Merits*

Since the balance of hardship weighs heavily in favor of Bendix, Martin Marietta must make a strong showing that it is likely to succeed on the merits of its claims. *Blackwelder Furniture Co. v. Seilig Manufacturing Co.,* 550 F.2d 189, 195–96 (4th Cir. 1977). It has not done so.

In evaluating allegations that a tender offeror has violated the disclosure provisions of the Williams Act, it is important to bear in mind the oft-quoted words of Judge Friendly:

> Probably there will no more be a perfect tender offer than a perfect trial. Congress intended to assure basic honesty and fair dealing, not to impose an unrealistic requirement of laboratory conditions that might make the new statute a potent tool for incumbent management to protect its own interests against the desires and welfare of the stockholders. It

would be as serious an infringement of these regulations to overstate the definiteness of the plans as to understate them.

*Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 948 (2nd Cir. 1969). *See also Susquehanna Corp. v. Pan American Sulphur Co.,* 423 F.2d 1075, 1085–86 (5th Cir. 1970) ("Though the offeror has an obligation fairly to disclose its plans . . . it is not required to make predictions of future behavior, however tentatively phrased, which may cause the offeree or the public investor to rely on them unjustifiably.") *Crane Co. v. Harsco Corp.,* 509 F.Supp. 115, 119 (D.Del.1981) (not required to "disclose those plans or designs which are necessarily contingent or indefinite.")

A careful consideration of the evidence reveals that Bendix does not have firm "plans" to divest Martin Marietta's non-aerospace divisions.[11] Martin Marietta cannot point to a single document evidencing any detailed scheme to divest the non-aerospace divisions. To the contrary, even the documents most heavily relied upon by Martin Marietta show nothing more than an analysis and discussion of possible divestiture by mid-level management.

However, the record is far less clear on whether Bendix has "proposals"—as distinct from plans—to divest the non-aerospace divisions.[12] The substantial number of documents prepared by the corporate development staff commenting favorably on divestment of some or all of Martin Marietta's non-aerospace divisions unmistakably indicates that, as late as August 5, mid-level Bendix management was considering proposals to divest these divisions.

Bendix argues, however, that these documents do not represent the views of Bendix' top management. While this may be true, these documents, prepared by the staff of the Bendix Vice-President responsible for acquisitions and divestitures, must have been brought to the attention of Agee, Mc-

11. See footnote 9.

12. Neither the parties nor this Court uncovered any legislative history or case law on the mean-

ing of the word "proposals" in Section 14(d). Dictionary definitions of the word vary widely and are generally unhelpful.

Donald and Kayser.[13] It is significant that Bendix has not produced any documents written by these three men rejecting or otherwise commenting on the divestment recommendations of Hastie's staff. Surely, it is reasonable to infer that Bendix' top management has considered proposals to divest Martin Marietta's non-aerospace divisions in the recent past.

While the evidence produced by Bendix weakens the strength of this inference, it by no means extinguishes the inference. Thus, the fact that Bendix' board of directors was not informed of any divestiture proposals and the fact that Salomon Brothers was not asked to prepare a divestiture report on the non-aerospace divisions may indicate no more than a Bendix' top management decision to not disclose the inchoate divestiture proposals they were considering. Similarly, the testimony of Agee, McDonald and Kayser is not wholly inconsistent with the inference that they had considered, and were still considering, divestment of the non-aerospace divisions at the time of Bendix' tender offer. Nonetheless, an examination of the evidence thus far submitted requires this Court to conclude that it is more likely than not that Bendix does not now—nor did it at the time it tendered for Martin Marietta stock—have proposals to divest Martin Marietta's non-aerospace assets.

However, Bendix could have and should have made more detailed disclosures of its intentions regarding Martin Marietta's non-aerospace divisions. As noted previously statements similar to those made by the offeror in *Grumman* would have more accurately apprised Martin Marietta's shareholders of Bendix' thoughts regarding the non-aerospace divisions. While the failure to make such statements cannot now be said to be a violation of the Williams Act, *see Wellman v. Dickinson,* 475 F.Supp. 783, 832–33 (S.D.N.Y.1979), it may well expose Bendix to suits by Martin Marietta shareholders if Bendix divests some or all of the non-aerospace divisions in the near future. *Cf. Copperweld Corp. v. Imetal,* 403 F.Supp.

579, 603 (W.D.Pa.1975); *Jewelcor, Inc. v. Pearlman,* 397 F.Supp. 221, 237–238 (S.D.N.Y.1975). But the failure to do so does not justify enjoining its offer.

Before closing the discussion on the merits of Martin Marietta's claims, it should be pointed out that the conclusion of this section is in harmony with the four district court cases discussing the requirements for a tender offeror to disclose its intentions regarding the sale of some or all of the target's assets. In the three cases where injunctions were issued against the tender offers, the offerors had much firmer intentions with respect to the divestment of the target's assets than the record reveals that Bendix has in this case.

In *Marshall Field & Co. v. Icahn,* 537 F.Supp. 413, 415–16 (S.D.N.Y.1982) the offeror failed to disclose that it had considered the sale of the target's real estate assets, notwithstanding evidence that the offeror had a study prepared concluding that the real estate assets were worth more on a liquidation basis than as part of an ongoing concern.

In *Pargas, Inc. v. Empire Gas Corp.,* 423 F.Supp. at 209, Chief Judge Kaufman of this District issued a preliminary injunction against an offeror, who, unlike Bendix, did not even disclose that it had considered certain post-acquisition transactions.

In *General Host Corp. v. Triumph American, Inc.,* 359 F.Supp. 749, 753–55 (S.D.N.Y.1973), the offeror's only major previous acquisition revealed it was likely to sell some of the target's assets to finance its tender offer and the failure to so disclose warranted injunctive relief.

Lastly, in *Grumman,* the court held that the offeror's disclosure regarding its intentions to divest the target's non-aerospace business was in compliance with the Williams Act. Though, as noted, the offeror in that case gave a more detailed statement of its intentions than did Bendix, it is also true that the offeror had firmer plans than indicated by the evidence relating to Bendix.

---

**13.** Indeed, both Agee and McDonald testified that they saw some of these documents.

**542**

*Public Interest*

The public interest requires that a probably legal tender offer such as Bendix' offer be permitted to proceed without intervention by the courts. As the Supreme Court noted in *Edgar v. MITE Corp.,* —— U.S. at ——, 102 S.Ct. at 2641–2642, the effects of blocking a nationwide tender offer are substantial.

> Shareholders are deprived of the opportunity to sell their shares at a premium. The reallocation of economic resources to their highest valued use, a process which can improve efficiency and competition, is hindered. The incentive the tender offer mechanism provides incumbent management to perform well so that stock prices remain high is reduced.

In conclusion, the Court finds that Bendix would be more seriously harmed by the issuance of an injunction than Martin Marietta would be harmed by its non-issuance. Moreover, Martin Marietta has failed to make a strong showing that it is likely to prevail on the merits. Lastly, the public interest argues against the issuance of an injunction.

Accordingly, for the reasons stated herein, it is this 16th day of September, 1982,-by the United States District Court for the District of Maryland, ORDERED:

That Martin Marietta's motion for a preliminary injunction BE, and the same IS, hereby DENIED.