Patricia **AQUIN**, Plaintiff,

v.

**BENDIX CORPORATION,**
**Defendant/Third Party**
**Plaintiff,**

v.

**CROSS & TRECKER CORPORATION,**
**Third Party Defendant.**

**No. 84–CV–3010–DT.**

United States District Court,
E.D. Michigan, S.D.

May 30, 1986.

James E. Wynn, Milmet, Vecchio, Ward & Carnago, POC, Detroit, Mich., for plaintiff.

Thomas G. Kienbaum, Detroit, Mich., Attorney for Bendix.

David M. Hayes, Detroit, Mich., for Cross & Trecker.

## OPINION

COHN, District Judge.

### I.

### A.

■ This is an action to determine whether a decision by a welfare benefit plan administrator to deny severance benefits was "arbitrary and capricious." Plaintiffs are two groups of former Bendix Corporation (Bendix) employees. The initial plaintiffs are forty-one (fifty-eight, after the first amended complaint) former salaried employees of Bendix Machine Tool Corporation (BMTC), a wholly-owned subsidiary of Bendix. They are joined in the first amended complaint by a group of sixty-three former salaried employees of Bendix's Industrial Controls Division (ICD). Both groups were covered by Bendix's plan for Separation Allowance Benefits for Salaried Employees, Policy No. 1205 (the Plan). The Plan was adopted on February 1, 1978 and amended effective September 17, 1982 and covers the terms and conditions relating to payment of severance benefits.

On April 19, 1984, Cross & Trecker Corporation (C & T) purchased the assets of BMTC and ICD and at the same time hired plaintiffs.[1] Plaintiffs did not lose a day's pay,[2] continued in their same jobs, were

1. The record indicates that 222 BMTC and 113 ICD employees were involved in the sale to C & T. Only about 36% of those employees are plaintiffs here. The record does not reveal the situation other employees found themselves in or why the others have not joined in this case. Further, the record indicates that five other Bendix business units, employing another 1395 employees, were also sold since the 1982 amendments to the Plan. In each case, severance benefits were not paid because employees were offered 100% of their previous pay with the Bendix units. Thus, plaintiffs are only about seven percent of salaried employees affected by Bendix divestments since September 17, 1982 who did not receive severance pay.

2. At a hearing on March 13, plaintiffs' counsel said plaintiffs may have lost one day's work while filling out employment forms for C & T. Under the circumstances of the sale by Bendix and employment by C & T of plaintiffs, i.e., at most there may have been a day or two interruption, I am satisfied that any time lost was *de minimis*. The Bendix/C & T agreement provided that C & T was deemed to have employed all of the Bendix employees.

paid 100% of their previous salaries with the Bendix units, and were not requested to relocate. However, their benefits were decreased and C & T does not have a severance plan. In August of 1984, C & T resold the ICD operation to Dynapath, Inc. (Dynapath), which is not party to the case, under conditions similar to the ICD sale to C & T.

The BMTC plaintiffs filed suit on June 28, 1984 alleging that they were terminated from employment with Bendix under conditions entitling them to severance pay as well as other benefits. On October 1, 1984 plaintiffs, at my suggestion, submitted a request for review of their claim for severance pay to the Bendix Separation Plan Committee (the Committee).[3] On November 6, 1984, proceedings were temporarily stayed pending the Committee's decision. Plaintiffs had a hearing before the Committee on December 6, 1984. Relying on the written opinion of its special counsel, the Committee on December 28, 1984 denied plaintiffs' claim for severance pay as not covered by the Plan.

The BMTC plaintiffs amended the complaint on March 27, 1985, alleging that the Committee's decision was "arbitrary and capricious" and should be set aside. The amended complaint added Allied Corporation (Allied) as a defendant since it became the successor administrator of the Plan on August 13, 1984. The amended complaint also added the IDC plaintiffs. On May 30, 1985 the Committee held a hearing on the IDC employees' claim for severance pay. This claim was based on the original sale to C & T and the subsequent resale by C & T to Dynapath. The Committee denied the IDC plaintiffs' claim on August 13, 1985, adopting the reasoning of its earlier decision as to the BMTC employees.

### B.

#### 1.

Defendants Bendix and Allied have moved for partial summary judgment, Fed.

R.Civ.P. 56, asking for a determination that they are not liable for severance pay to plaintiffs. Plaintiffs have filed a cross-motion for partial summary judgment on the same claim. Plaintiffs' claims for other benefits are not involved in the motion. There is no dispute that plaintiffs are both "participants" and "beneficiaries" under the Plan, 29 U.S.C. § 1002(7), (8), that defendants were and are the Plan "administrator," 29 U.S.C. § 1002(16), and that the severance pay policy is an "employee welfare benefit plan" as defined in 29 U.S.C. § 1002(1).

#### 2.

The moving parties on the motions have a heavy burden. Their papers must clearly show the true facts and exclude any real doubt as to the existence of any genuine issue of material fact. *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967, *reh'g denied,* 322 U.S. 767, 64 S.Ct. 941, 88 L.Ed. 1593 (1944); 6 *Moore's Federal Practice* ¶ 56.-15[3], at 56–466 to –467. Their papers must also show they are entitled to judgment as a matter of law. *Ghandi v. Police Dep't of the City of Detroit,* 747 F.2d 338, 344 (6th Cir.1984). Furthermore, the movants' papers are closely scrutinized, while the opponents' papers are indulgently treated. *Watkins v. Northwestern Ohio Tractor Pullers Ass'n, Inc.,* 630 F.2d 1155 (6th Cir.1980). The evidence before me must be viewed and the inferences must be drawn in the light most favorable to the opposing party. *Smith v. Hudson,* 600 F.2d 60 (6th Cir.), *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979).

### C.

#### 1.

The standard of review to be applied to the Committee's decision has been variously described as whether its interpretation of the Plan is arbitrary, capricious, in bad faith, erroneous as a matter of law, or

---

**3.** Plaintiffs presented their claims to the Committee because of my concerns that they had to first exhaust their remedies under the Plan. *See*

*Kross v. Western Electric Co., Inc.,* 701 F.2d 1238, 1245 (7th Cir.1983); *Amato v. Bernard,* 618 F.2d 559, 568 (9th Cir.1980).

unsupported by substantial evidence. *Blakeman v. Mead Container*, 779 F.2d 1146, 1149–50 (6th Cir.1985); *Moore v. Reynolds Metal Co. Retirement Program for Salaried Employees*, 740 F.2d 454, 457 (6th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 786, 83 L.Ed.2d 780 (1985); *Rhoton v. Central States Southeast & Southwest Areas Pension Fund*, 717 F.2d 988, 989 (6th Cir.1983); *Rolando v. Babcock & Wilcox Co.*, No. 84–CV–5009–DT, slip op. at 3 (E.D.Mich. Feb. 20, 1986) [Available on WESTLAW, DCTU database]. In conducting the review, I should focus on the language of the provisions at issue to see if they can support the Committee's interpretation. *Rhoton*, 717 F.2d at 990.

### 2.

The parties dispute the proper scope of my inquiry under the arbitrary and capricious standard. Defendants agree with plaintiffs that my "inquiry into the facts is to be searching and careful," *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), but they argue for a "narrow inquiry." *Id.* The Court of Appeals for the Sixth Circuit has recently defined the standard of review in a severance pay case as whether the interpretation of the administrator is "grounded on any reasonable basis." *Blakeman*, 779 F.2d at 1150. Defendants also agree with plaintiffs that I may focus on the process the Committee used in reaching its determination and whether the process shows evidence of bad faith.

Plaintiffs, on the other hand, argue that I should not be so deferential to the Committee's decision. They argue that a "combination of danger signals," *Maggard v. O'Connell*, 671 F.2d 568 (D.C.Cir.1982), rebuts the presumption that the Committee has acted regularly and requires a higher level of judicial scrutiny. *See also Gilbert v. Burlington Indus., Inc.*, 765 F.2d 320, 328–29 (2d Cir.1985); *Jung v. FMC Corp.*, 755 F.2d 708, 711–12 (9th Cir.1985); *Blau v. Del Monte*, 748 F.2d 1348, 1353 (9th Cir.1984), *cert. denied*, —— U.S. ——, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985). The "danger signals" in plaintiffs' view include violations of ERISA procedural requirements, inconsistent applications of the Plan, undue bias toward Bendix and Allied by the Committee, the avoidance of a very substantial outlay by denying benefits; and "rubberstamping" of the special counsel's recommendation by the Committee.

Even if I should give less deference to the Committee's decision under these circumstances, I do not find that the "danger signals" here rise to a level that requires more than a "reasonable" explanation. *See Anderson v. Ciba-Geigy Corp.*, 759 F.2d 1518, 1521 (11th Cir.), *denial of reh'g*, 767 F.2d 938, *cert. denied*, —— U.S. ——, 106 S.Ct. 410, 88 L.Ed.2d 360 (1985); *Jung v. FMC Corp., supra.* Applying the "reasonable basis" standard, I find that the Committee's interpretation of the Plan is reasonable and, therefore, plaintiffs are not entitled to severance benefits.

### II.

### A.

The stated purpose of the Plan is:

To establish procedures governing the separation of salaried employees from employment with Bendix and to provide allowances and payments to assist eligible employees during the resulting transition period or alleviate conditions of hardship resulting from loss of employment.

The Plan as amended in 1982 provides that benefits will be paid in case of a reduction in force (RIF). A RIF (as opposed to a quit) is defined in paragraph C.4 of the Plan as follows:

4. *Reduction in Force*—means an involuntary separation because the employee's position is eliminated as a result of a reduction in personnel, declining business, discontinuance of operations or location closings; provided, however, that an employee who refuses an offer of alternative employment in a suitable salaried position at the same location or at another facility, subsidiary or affiliate of Bendix, will be separated as a *quit.*

An employee who is employed at a unit or facility which for any reason (including sale or divestiture) ceases to be owned or operated by Bendix, and who upon termination from Bendix declines an offer of employment, by a successor employer which assumes control of the unit or facility, shall be classified as a *quit* unless

(a) the base monthly salary rate offered by the successor employer is less than 100% of the base monthly salary rate paid by Bendix at the time of the employee's termination from Bendix; or,

(b) such employee is terminated by the successor employer as part of a reduction in force or on the basis of inability to perform duties as defined herein, within one year after accepting such employment.[4]

(Emphasis added.) Quit is defined earlier in paragraph C.2 of the Plan as "a separation initiated by, and voluntary on the part of the employee."

As described above, the Plan explicitly specifies how to treat employees in a number of situations, including:

(1) those whose positions are eliminated and are not offered subsequent employment at all (RIF);

(2) those who are offered unsuitable alternative employment and leave Bendix (RIF);

(3) those who decline an offer by a successor employer to Bendix at less than 100% of the employee's previous pay (RIF); and

(4) those who decline an offer by a successor employer to Bendix at 100% previous pay (quit).

Provisions relating to employees in each of these situations are contained in the second full paragraph of C.4 and sub-paragraph C.4(a) of the 1982 version of the Plan. The

above four situations do not require resort to sub-paragraph C.4(b) of the 1982 version of the Plan, which deals with termination by the successor employer within the first year of employment.

### B.

Importantly, there is no explicit provision for employees who *accept* employment with a successor employer to Bendix at 100% of previous pay, precisely the facts presented by plaintiffs' situation. The special counsel determined that "such [an] employee" as described in 1982 Plan sub-paragraph C.4(b) logically could not be "terminated ... within one year" if he had "decline[d] an offer of employment" (Plan language). Therefore, sub-paragraph C.4(b) must be construed to apply to employees who *accept* employment with a successor employer to Bendix; such employees are quits unless terminated by the successor within one year after accepting employment. The Committee's special counsel therefore interpreted sub-paragraph C.4(b) in such a way as to apply to employees in plaintiffs' situation and, at the same time, not make sub-paragraph C.4(b) nugatory. *Compare Morse v. Stanley*, 732 F.2d 1139, 1147 (2d Cir.1984) (adopting claimant's interpretation of plan would read out of plan other explicit language) *and Bayles v. Central States, Southeast & Southwest Areas Pension Fund*, 602 F.2d 97, 100 (5th Cir. 1979) (adopting claimant's interpretation of ambiguous language would render another section of plan meaningless and was therefore properly rejected).

The special counsel found this interpretation to be consistent with the parallel provision in the 1978 Plan to sub-paragraphs C.4(a) and (b) of the 1982 version. The 1978 Plan provides:

---

**4.** A virtually identical definition of RIF appears in paragraph C.1 of Bendix's plan for Reduction in Force of Salaried Employees, Policy No. 1202, as amended April 1, 1983. Policy 1202 details procedures to be used in making reductions in force. It refers to Policy 1205 for deciding under what circumstances employees involved in a RIF are entitled to severance pay.

Plaintiffs' contention that the definition of RIF in Policy 1202 controls over Policy 1205 for purposes of awarding severance pay is dissembling. The policies are interpreted in tandem, but only Policy 1205 determines who shall receive severance pay. Thus, defendants are correct that Policy 1202 is irrelevant to my decision.

An employee who is employed or offered employment with a successor employer which acquires ... a Bendix operation will be separated as a quit if continuity of employment is offered or maintained under substantially equal conditions.

While the 1982 Plan does not explicitly provide for the situation where continuity of employment is maintained, the special counsel interpreted the 1982 version of the Plan to be consistent with the 1978 Plan despite the obviously poor draftsmanship of the 1982 amendments. It was fair in the view of the special counsel (and in my view) to look to the 1978 Plan because the 1982 changes in paragraph C.4 were obviously designed to eliminate the ambiguity of the words "substantially equal conditions" and to provide for severance pay should the successor employer terminate employment within one year under defined circumstances. The 1982 version of the Plan clarifies that a person is a quit if he declines employment with a successor employer at 100% of previous pay, an objective test.

The special counsel's interpretation has the following effect: it characterizes all persons who *decline* employment as quits (if they are offered 100% pay) and, at the same time, characterizes all persons who *accept* employment as quits, too. The reasoning offered by the special counsel is that persons who decline employment that would not make them any worse off in terms of base pay are not entitled to severance benefits under the clear language of the Plan. Since persons who accept employment are in an even better economic position, they should not be entitled to benefits either. To the special counsel, this interpretation simply advances the Plan's purpose to prevent hardship caused by involuntary unemployment.

Plaintiffs argue that such an interpretation is disingenuous and contradictory. They argue that if persons who decline employment at 100% pay must be quits and thus not entitled to severance pay, then those who accept employment must not be quits and are thus entitled to severance pay. They also argue that the purpose of the Plan is not merely to minimize hardship during unemployment, but also to minimize hardship during transition to employment with the successor.

I agree with the special counsel's description of plaintiff's position as "simplistic logic." A reasonable view of the Plan's purpose is to minimize hardship caused by lack of employment with Bendix *or* a successor employer. Plaintiffs offer a number of interpretations of the Plan's language that would produce reasonable, contrary results. For example, looking at the Plan's purpose language, they argue that the Plan is aimed at any "separation ... from employment with Bendix"—not the disappearance of their jobs from the face of the earth. One court has accepted such an argument over an administrator's denial of benefits. *See Blau v. Del Monte*, 748 F.2d at 1354–55. Other courts, however, have recognized that a Plan, "when read as a whole," *Sly v. P.R. Mallory & Co., Inc.*, 712 F.2d 1209, 1212 (7th Cir.1983), would support a conclusion that the Plan defines "separation" or "elimination" in such a way that it does not include cases where employees accept subsequent employment with a successor corporation. *See, e.g., Jung*, 755 F.2d at 712–13. As discussed above, sub-paragraph C.4(b) of the 1982 version of the Plan suggests overall that accepting employment with C & T is not the kind of "separation" from Bendix that requires severance pay.

Plaintiffs also argue that unemployment is not a condition to receiving severance pay, since a former Bendix employee can receive such benefits under the Plan even if he is working for another employer. Thus, plaintiffs argue, severance benefits must also be payable during the transition between Bendix and a successor employer, not just during unemployment. They rely upon the conjunctive "or" in the purpose clause: "to assist eligible employees during the resulting transition period *or* alleviate conditions of hardship resulting from loss of employment." This language is ambiguous. One possible interpretation is that payments will be made upon either unem-

ployment *or* transition to any employer other than Bendix, including a successor employer. Plaintiffs obviously favor this reading. Another interpretation, however, is that payments will be made to assist *or* alleviate hardship resulting from loss of employment, even though the former Bendix employee is not unemployed but is working for someone else (other than a successor employer) or is in transition to such other employment. This is the special counsel's interpretation. Both are reasonable and both conflict somewhat with other Plan language. Plaintiffs' interpretation ignores the fact that the "separation" referred to in the purpose clause is also defined in paragraph C.4 and covers separation from Bendix *or* a successor employer. Admittedly, the special counsel's interpretation conflicts with the literal language in paragraph C.2 that a quit is an act initiated and voluntary by the employee. While the drafter certainly could have done a better job, ambiguities are not automatically construed in favor of plaintiffs in ERISA welfare benefit cases. *See Jung,* 755 F.2d at 713. The Committee's interpretation is reasonable, and that is sufficient under *Blakeman.*[5]

### C.

The majority of federal courts faced with similar fact situations have upheld denials of benefits. *See, e.g., Blakeman, supra; Holland v. Burlington Indus., Inc.,* 772 F.2d 1140 (4th Cir.1985); *Anderson, supra; Jung, supra; Sly, supra; Adcock v. Firestone Tire & Rubber Co.,* 616 F.Supp. 409, 422 (M.D.Tenn.1985); *Pinto v. Zenith Radio Corp.,* 480 F.Supp. 361 (N.D.Ill.1979), *aff'd,* 618 F.2d 110 (7th Cir.1980). *Cf. Trotter v. Amalgamated Ass'n of Street Electric Railway and Motor Coach Employees of America,* 309 F.2d 584, 586 (6th Cir. 1962) (the term "reduction in the forces of labor" did not occur upon the sale of suburban bus lines between two bus operators). To conclude otherwise would be merely to grant a windfall to plaintiffs. *See Sly,* 712 F.2d at 1211; *Rolando, supra.*

### D.

The resale of IDC by C & T to Dynapath invoked sub-paragraph C.4(b) of the 1982 version of the Plan because it was a termination by the successor employer within one year after the IDC employees accepted employment with C & T. The Committee determined that the definition of RIF for purposes of the resale should be consistent with the definition of RIF and quit for the original sale. Therefore, the Committee denied severance benefits again on the basis of its earlier reasoning. The IDC plaintiffs argued that since they did not voluntarily transfer to Dynapath, they cannot be quits; the Committee rejected the IDC plaintiffs' definition of quit, pointing out that employees who do not meet the Plan's definition of RIF are necessarily quits irrespective of whether those employees transferred involuntarily.

The drafter of a legal instrument is his own lexicographer. *See* 3 Corbin on *Contracts* § 544 (1960). As Corbin said, "There is no rule of either law or language that requires the parties to a contract to comply with any standard of usage or interpretation in choosing the words by which they express their intentions." *Id.* § 572B, ¶ 3 (Supp.1971), cited in *Ford Motor Co. v. Certain Underwriters at Lloyd's London and Co.,* No. 83–CV–3775–DT, slip op. at 8 (E.D.Mich. Mar. 19, 1986) [Available on WESTLAW, DCTU database]. As discussed above, the Committee's characterizing employees who accept employment with a successor employer as quits is rational. The definition of RIF in sub-paragraph C.4(b) of the 1982 version of the Plan should be interpreted the same as in the rest of the Plan. To quote Corbin again, "A subsidiary provision should be so interpret-

---

**5.** To classify as a "quit" one who obtains employment with a successor reminds one of Humpty Dumpty's frequently quoted statement, " 'When *I* use a word,' Humpty Dumpty said in a rather scornful tone, 'it means just what I choose it to mean,—neither more nor less.' "— Lewis Carroll, *Through the Looking-Glass,* ch. 6. See discussion at part II. D, *infra.*

ed as not to be in conflict with what clearly appears to be the 'dominant purpose' of the contract." *Id.* § 547, at 173–176.[6]

## III.

■ Plaintiffs argue that the 1982 amendments to paragraph C.4 are "material." For purposes of this motion, defendants agree that they are material. If material, ERISA requires defendants to have provided certain information to the Secretary of Labor, 29 U.S.C. §§ 1022(a)(2), 1024(a)(1)(D), and Plan participants, §§ 1022(a)(1), 1024(b)(1). These provisions require that the administrator have:

    (1) Prepared and given to each participant a written summary of any material modification no later than 210 days after the close of the Plan year;

    (2) Filed the modified Plan with the Secretary of Labor within 60 days after the modification was effective, and filed the summary plan description at the same time it was required to be given to participants.

**6.** Whether or not the Plan was a contract, *see Adcock,* 616 F.Supp. at 417–19, the principle is apt.

**7.** One of plaintiffs' exhibits purports to be the complete file of the Secretary of Labor regarding the Plan. The cover sheet of the exhibit, however, shows that the Secretary sent to plaintiffs only those annual reports and parts of the "Record Requested." It is possible that plaintiffs simply did not request any annual reports for periods after the 1981 Plan year, since the next filed annual report would likely have been filed after the sales of BMTC and IDC to C & T and thus irrelevant to this cause.

**8.** To be sure, the years 1982 to 1984 were tense times for Bendix as it attempted to and did acquire beneficial control of Martin Marietta Corporation (Martin Marietta) by tender offer and, in turn, Martin Marietta and United Technology Corporation together attempted to acquire (and Martin Marietta did acquire) control of Bendix by counter tender offers. *See generally Mesa Petroleum Co. v. Cities Service Co.,* 715 F.2d 1425 (10th Cir.1983); *Martin-Marietta Corp. v. Bendix Corp.,* 690 F.2d 558 (6th Cir. 1982); *Martin Marietta Corp. Bendix Corp.,* Fed. Sec.Rep. (CCH) ¶ 99,067 (2d Cir.1982); *Martin Marietta Corp. v. Bendix Corp.,* 549 F.Supp. 623

## A.

Defendants did not file with the Secretary of Labor the modified 1982 Plan or the summary plan description (discussed below) that was given to Plan participants. The record also does not show that defendants have filed an annual report for the Plan at any time since the 1981 Plan year ending September 30, 1982, which was tardily filed June 3, 1983, even though one is required to be filed each year within 210 days of the end of the Plan year, 29 U.S.C. § 1024(a)(1)(A).[7]

In any case, these procedural delinquincies do not rise to the level seen in *Blau v. Del Monte Corporation* so as to entitle plaintiffs to severance benefits. Unlike Del Monte's actions as administrator, defendants did not conceal the Plan from participants, or fail to create procedural mechanisms for benefit determinations, or make "no attempt to comply with any of the duties that ERISA places upon a benefit plan administrator." *Id.,* 748 F.2d at 1352. I just cannot say that the decision to deny benefits here "was made in the course of, and ... infected by, these ERISA violations." *Id.,* 748 F.2d at 1353.[8] In a case

(D.Md.1982); *Martin Marietta Corp. v. Bendix Corp.,* Fed.Sec.Rep. (CCH) ¶ 99,068 (S.D.N.Y. 1982); *Martin Marietta Corp. v. Bendix Corp.,* 547 F.Supp. 533 (D.Md.1982); *Bendix Corp. v. Martin Marietta Corp.,* 547 F.Supp. 522 (D.Md. 1982); Allan Sloan, *Three Plus One Equals Billions: The Bendix-Martin Marietta War* (1983). During this period, Bendix divested itself of certain business units. Also, Allied acquired Bendix by voluntary merger. A proxy statement to Bendix shareholders in December, 1982 indicates that the 1982 Plan amendments became effective on the same day Bendix acquired beneficial control of Martin Marietta, which was also the day negotiations began between Allied and Bendix and only one week before Bendix signed a tentative agreement to be acquired by Allied. At the hearing on March 13, counsel for plaintiffs suggested that Bendix was engaged in a *sub rosa* scheme to finance its effort to acquire Martin-Marietta by making it cheaper to spin off divisions by limiting its need to pay severance benefits under the Plan. A different purpose for the 1982 amendments is suggested in plaintiffs' brief, *viz.* making Bendix cheaper for the friendly acquisition by Allied. Despite these allegations and the environment in which the 1982 amendments were made, there is just no evidence of foul play by Bendix in the manner in which it amended the Plan. I

such as this, a fiduciary's failure to comply with ERISA's procedural requirements does not entitle claimants to any substantive remedy. *Wolfe v. J.C. Penney Co.,* 710 F.2d 388, 393 (7th Cir.1983). Only the Secretary of Labor has standing to complain in the absence of reliance or prejudice to the claimants. *See Freund v. Gerson,* 610 F.Supp. 69, 71 (S.D.Fla.1985); *Rubin v. Decision Concepts, Inc.,* 566 F.Supp. 1057, 1059 (S.D.N.Y.1983).

### B.

The 1982 Plan amendments were substantially communicated to plaintiffs by a revised "Summary Plan Description" (SPD) dated April, 1983 and given to plaintiffs on May 18, 1983.[9] The relevant portion of the SPD says on page one:

> You will be separated as a "quit" and will not be eligible for a separation allowance if:
>
> ● you refuse an offer of alternate employment in a suitable salaried position at the same Bendix location or at another facility, subsidiary or affiliate of Bendix; or
>
> ● you decline an offer of employment by a successor employer which assumes control of the Company unit or facility at which you work, unless:
>
> –the base monthly salary offered by the new employer is less than 100% of your base monthly salary at the time of your termination from Bendix; or,
>
> –you are terminated by the new employer as part of a reduction in force or on the basis of inability to perform duties, as defined in this Plan, within one year after accepting such employment.

Defendants argue that this language is misleading under ERISA. 29 U.S.C. § 1022(a)(1) requires that the SPD "be written in a manner calculated to be under-

stood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." The regulations, 29 C.F.R. § 2520.102–2(b), require that the "format of the [SPD] must not have the effect [of] misleading, misinforming or failing to inform participants and benificiaries. Any description of exception, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant." Section 2520.-103(1) requires that the SPD include "a statement clearly identifying circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture or suspension of any benefits that a participant might otherwise reasonably expect the plan to provide on the basis of the description of benefits...." No separate summary of the modifications themselves is required so long as they are described in a timely SPD. § 2520.104b–3(b).

Clearly, the SPD language parallels the Plan language, substituting the word "you" for "such employee" and generally attempting to simplify the Plan language. The language was written in a manner calculated to be understood by laypersons, not lawyers. Although the SPD mirrors the ambiguity inherent in the Plan language itself, the statute and regulations require only "reasonable" apprisal, not absolute certainty. As discussed above, the language can reasonably be understood to mean that employees accepting job offers with C & T would not receive severance pay unless they were terminated within one year under circumstances satisfying the Plan's definition of reduction in force. A reasonable employee would have understood this to be a condition of receiving

---

find Bendix substantially complied with ERISA's requirements for disclosure to its employees.

**9.** See part III.C, *infra.* As noted above, the sale to C & T occurred on April 19, 1984. Although the record is ambiguous, there is evidence that plaintiffs may have received notice of its pend-

ency as early as February 6, 1984 along with employees of other Bendix units sold on the same day. Whether or not plaintiffs received this notice, there is no evidence that the sale of BMTC and IDC was kept a secret from plaintiffs. There is also no evidence that any plaintiff either inquired about or relied on the severance pay provisions of the Plan to his detriment.

severance pay based on the SPD provided. *Cf. Morse v. Stanley, supra* (description in SPD was sufficiently accurate and comprehensive to give fair notice to participants of their rights despite failure to spell out certain aspect of policy); *Phillips v. Amoco Oil Co.,* 614 F.Supp. 694, 724–25 (N.D.Ala. 1985) (company complied with disclosure requirements although SPD did not disclose that divisional employees could lose retirement benefits if division were sold where SPD referred to fact that eligibility would be lost if employment were terminated).

### C.

There is a dispute as to whether the SPD was provided to Bendix employees within 210 days of the close of the Plan year. Defendants claim they were not tardy because they changed the Plan year in 1982 to the calendar year. Plaintiffs claim that the prior Plan year ended September 20, 1982 and was not effectively changed. As noted above, the SPD was given to employees on May 18, 1983, 240 days after the original Plan year.

It is unnecessary to determine whether defendants effectively changed the Plan year. Assuming *arguendo* that defendants were 30 days tardy, there was no prejudice to plaintiffs. *See Adcock,* 616 F.Supp. at 420 (noncompliance with reporting and disclosure requirements did not impose such substantive harm upon employees as would entitle them to payment of severance benefits where noncompliance was not flagrant and pervasive). *Cf. Pollock v. Castrovinci,* 476 F.Supp. 606, 618 (S.D.N.Y.1979), *aff'd,* 622 F.2d 575 (2d Cir. 1980) (no prejudice shown by plaintiff). The plaintiffs received sufficient notice of Plan changes almost one year before the sale to C & T. There is also no merit to plaintiffs' argument that they stayed with Bendix, rather than seeking alternative employment, because they believed they would receive severance pay. Plaintiffs admit to the "great deal of uncertainty among the salaried work force concerning

their future with Bendix." Considering the choppy sea they were sailing on during the "take-over wars," as plaintiffs characterize the activity at Bendix,[10] their detrimental reliance argument is without merit. In any case, had plaintiffs voluntarily quit to seek alternate employment, they would not have received severance pay.

### D.

The BMTC plaintiffs also were notified by letter on April 19, 1984 (the day C & T acquired legal ownership) of their employee status with C & T. The letter provided:

2. A former Bendix Machine Tool Corporation salaried employee who applies for employment with the Cross Company and receives a valid offer of employment from the Cross Company and subsequently rejects that offer of employment will be considered to have "Voluntarily Terminated" their employment and will *NOT BE ELIGIBLE* for benefits under the Allied-Bendix Separation Policies related to Reduction-in-Force.

(Original emphasis.) The letter is ambiguous about the impact on severance benefits of *accepting* employment with C & T. Again, this is because the letter parallels the language of paragraph C.4 of the 1982 version of the Plan. Employees might reasonably have read the letter's provision that those who *turned down* offers would *not* receive severance pay to mean that those who *accepted* offers *would* receive severance pay. This is the same argument raised by plaintiffs and rejected above as to the Plan's originating language. The letter simply indicates that employees who turned down an offer by C & T would no longer be entitled to coverage by the Plan. The letter does not say that those who accepted offers would immediately receive severance pay. Benefits under the Plan have been reasonably interpreted above to mean that such employees would receive severance pay only if there was the equivalent of a RIF within one year of joining C & T.

**10.** See note 8, *supra.*

## IV.

### A.

The Committee made an effort to, and did apply the Plan consistently in similar situations. Bendix Policy No. 1202 set forth "procedures for consistent application of reductions of force." [11] There is no evidence in the record that Bendix applied the Plan inconsistently in other divestment situations. The prior inconsistent applications described by plaintiffs do not involve divestments and are thus irrelevant. *Anderson*, 759 F.2d at 1522; *Jung*, 755 F.2d at 713. They involve situations where employees were offered "alternate employment" with some connection to Bendix. As such, they do not invoke sub-paragraphs C.4(a) or (b) of the Plan.

Further, the payment of severance benefits in divestment situations and in situations where Bendix employees were offered "alternate employment" within Bendix has been generally consistent with no "significant departure from prior conduct under similar circumstances." *Adcock*, 616 F.Supp. at 423. Employees who declined "an offer of alternate employment in a suitable salaried position" were almost always denied severance pay (with one possible exception, discussed below). Those who received severance pay after declining an offer of alternate employment *within* Bendix did so because the pay or benefits of the alternate employment were not comparable or the offered job required relocation. A job was never considered "suitable" so that severance pay would be denied where relocation was required. Other employees who received severance pay without being asked to relocate did so either because new positions involved non-transferable engineering skills or because the employees took early retirement at Bendix's option.

There is only one apparent deviation from the general application of the Plan that the record does not adequately explain. A recommendation to the Separation Plan Committee indicates that in 1981 employees of the Engineering Development Center (EDC) in Southfield, Michigan received RIF benefits even though they had been offered comparable benefits in local operations. The memorandum involved recommended that, in the future, employees who refuse comparable local positions be considered quits. One member of the Committee, defendants point out, testified in deposition that engineering employees received RIF benefits when they had skills that were not transferable to an offered job. Also, the Director of Employee Benefits explained that this was not a deviation from past practice at all, but rather was determined to be administratively necessary because of unusual circumstances. Deviations were permitted by the 1978 Plan language. Where such language allows consideration of special circumstances, explainable inconsistent applications do not reflect adversely on an administrator. *See Pinto*, 480 F.Supp. at 363–64. It is not clear whether the EDC exception was made with the approval of the General Manager and the Vice President of Corporate Organization and Human Resources, as required by the Plan for deviations. Even assuming it was not, the dispute over the EDC situation is not material. A single inconsistency does not create a substantive remedy; it is only one factor to be considered. Plaintiffs have failed to demonstrate that Bendix's award of severance pay to EDC employees in 1981 was a radical departure from prior conduct. *Adcock*, 616 F.Supp. at 422. Considering the almost entirely consistent record of Plan application, plaintiffs are not entitled to severance pay under the circumstances here.

### B.

It is true that the Committee's decision preserved a large fund for defendants. Plaintiffs estimate this fund to be at least $3,000,000. But it is the fiduciary duty of defendants to preserve its welfare benefit funds against undue claims. *See* 29 U.S.C. § 1104(a)(1); *Morse*, 732 F.2d at 1145; *Maggard*, 671 F.2d at 571–72. That the

---

**11.** See note 4, *supra*.

Committee denied plaintiffs severance pay does not alone justify a conclusion that any or all members of the Committee or its special counsel were biased against plaintiffs. *See Morse*, 732 F.2d at 1146.

Further, there has been no showing that the special counsel, in making his recommendation, had any conflict of interest or predisposition to deny plaintiffs benefits. He was independent counsel. He was not employed to represent Bendix or Allied, and he is not now defending his recommendation to the Committee.

### C.

Plaintiffs argue that two of the five members of the Committee did not participate in the decisionmaking process, even though one of those who did not was the most knowledgable about prior interpretations of the Plan. They also argue that the Committee merely "rubber-stamped" the recommendation of special counsel. They claim that this does not constitute the "hard look" required of an administrator. *Maggard*, 671 F.2d at 571.

The reports of the Committee and its special counsel, together with the hearing transcripts, establish the "hard look" and "reasoned decisionmaking" required of an administrator. Plaintiffs provide no support for the proposition that all Committee members must participate in the decisionmaking process, so long as those who did fairly considered proper facts. A reviewing court is prevented from probing the extent of an administrative decisionmaker's reading and understanding of evidence. 3 K.C. Davis, *Administrative Law Treatise* § 17:3 (1980). Plaintiffs also cannot complain about Committee members' lack of prior knowledge regarding the Plan. It is a fair suspicion that had *more* Bendix employees sat on the Committee, plaintiffs would rely on this fact as additional evidence of undue bias toward defendants.

There is also no requirement that an administrative decisionmaker review all the evidence considered by its initial reviewer, here its special counsel. It is an accepted principal of administrative law that the final decisionmaker may rely on the opinion of its appointee and adopt his recommendation as its own. Administrative decisionmakers need not even read the evidence. They are required only to "consider and appraise" evidence but may do so through selected personnel. *Id.*

### V.

The welfare benefit fund here was administered not by government officials but by private trustees. Trustees act as "private administrators." *See Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1007 (4th Cir. 1985). No principal of law has been cited why private administrators may not use personnel to review evidence in the same manner as government administrative decisionmakers. Because private trustees may be less well insulated from private pressures, however, I have given even more scrutiny to the evidence. *See Maggard*, 671 F.2d at 571. Under this exacting standard of review, I am simply unable to find that the Committee's decision to deny severance benefits to plaintiffs was arbitrary or capricious. Even though plaintiffs may have suffered as a result of the sales of BMTC and IDC, they simply are not entitled to severance pay.

Defendants are entitled to a partial summary judgment on the issue of severance benefits. Defendant shall submit an appropriate form of judgment. The Deputy Clerk is instructed to schedule a status conference to discuss the remaining claims at issue.